TRINITY EVANGELICAL LUTHERAN CHURCH AND SCHOOL
FREISTADT, Plaintiff-Respondent,††

v.

TOWER INSURANCE COMPANY, Defendant-Appellant.†

Court of Appeals

*No. 01–1201. Oral argument December 18, 2001.—Decided January 30, 2002.*

## 2002 WI App 46

(Also reported in 641 N.W.2d 504.)

† Petition to review filed.
†† Petition to cross-review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Edward M. Crane* and *Charles F. Smith* of *Skadden, Arps, Slate, Meagher & Flom (Illinois)*, Chicago, Illinois, and *M. Christine Cowles* and *Barbara A. O'Brien* of *Borgelt, Powell, Peterson & Frauen, S.C.*, Milwaukee. There was oral argument by *Charles F. Smith* and *M. Christine Cowles*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Merrick R. Domnitz, Robert L. Jaskulski*, and *Anthony J. Skemp* of *Domnitz, Mawicke & Goisman, S.C.*, Milwaukee. There was oral argument by *Merrick R. Domnitz* and *Robert L. Jaskulski*.

Before Brown, Anderson and Snyder, JJ.

¶ 1.  ANDERSON, J.  Tower Insurance Company (Tower) appeals the judgment in favor of its insured, Trinity Evangelical Lutheran Church and School-Freistadt (Trinity), entered on a jury's verdict finding that punitive damages attached to a bad faith finding made by the trial court and awarding punitive damages in the amount of $3,500,000. Tower's principal contentions are that the trial court erred in granting summary judgment for Trinity on the issue of bad faith and erred as a matter of law by submitting punitive damages to the jury. Tower additionally contends that the punitive damages verdict was not obtained through a fair process and that the ends of justice warrant a new trial. Finally, Tower argues that the punitive damages verdict violates due process and Wisconsin public policy. We conclude that the trial court erred in granting summary judgment for Trinity on the issue of bad faith and remand for a trial on whether Tower's actions constitute bad faith.

## Background

¶ 2.  Trinity is comprised of a church and school located in Mequon, Wisconsin. The school services approximately 234 grade school children and employs eight teachers. Trinity owns property and real estate but does not own any automobiles. Prior to 1994, Trinity was insured by Heritage Insurance through Hackbarth Insurance Service, Inc. in Milwaukee, Wisconsin. Trinity carried hired and non-owned automobile insurance coverage because the teachers for Trinity occasionally, in the course of their employment, transported students to and from certain functions. The policy with Heritage was scheduled for renewal on February 10, 1994.

## Facts

¶ 3.   In 1994, prior to the renewal of the Heritage policy, Trinity decided to seek renewal quotations from other insurance carriers. Trinity dealt directly with Jim Rodrian of Rodrian and Associates, Inc. when obtaining an insurance quote. Because Trinity owned no vehicles, it informed Rodrian that it wanted hired and non-owned automobile coverage as part of its liability policy. Rodrian and Associates is an independent insurance agent that does business with, among others, Tower. Rodrian has an executed agency agreement with Tower, whereby Tower authorized Rodrian to "receive, accept and, in accordance with the Company's binding guide-lines, bind proposals for contracts of insurance for risks located in Wisconsin." Rodrian requested a coverage quote for Trinity from Tower. He dealt with Harold Fischer, an underwriter at Tower. He provided Fischer with basic information regarding the risk, and passed on information regarding quotes given to Trinity from other insurance carriers. In addition to discussing other coverage with Fischer, Rodrian told Fischer that Trinity wanted hired and non-owned automobile coverage on the policy. Rodrian received a quote from Fischer that Rodrian believed included the hired and non-owned automobile coverage requested. Rodrian provided this information to Trinity. Trinity accepted Tower's quote. Fischer authorized Rodrian to bind coverage on behalf of Tower.

¶ 4.   On February 10, 1994, Rodrian forwarded a pre-application binder to Trinity that included coverage for hired and non-owned automobiles. After the binder was sent to Trinity, the application was filled out for the issuance of the policy. Inadvertently, Rodrian failed to check the box requesting hired and non-owned insur-ance coverage on the application. Tower subsequently

issued a policy to Trinity without the hired and non-owned coverage. None of the parties or participants spotted the error at that time.

¶ 5.  On January 24, 1995, Lorrie Erdman, a teacher at Trinity, while transporting students from the school in the course of her employment, ran a stop sign and collided with another vehicle. The collision resulted in serious injuries to the other vehicle's driver and passenger.

¶ 6.  Trinity notified Rodrian of the potential claim. Upon review of the policy, Rodrian discovered that there was not any hired and non-owned automobile vehicle coverage indicated. In a letter to Carol Blackwell, a district manager in Tower's underwriting department, dated January 31, 1995, Rodrian informed Tower of the accident and of the fact that he had mistakenly failed to request hired and non-owned automobile coverage on the application. He requested that Tower backdate Trinity's coverage.

¶ 7.  In response to Rodrian's letter, Blackwell drafted a memo to Gene Gallagher, the vice president and director of operations at Tower. Blackwell's memo recapped the circumstances surrounding Rodrian's error and asked for direction as to how to handle Rodrian's request to backdate coverage.

¶ 8.  Within twenty-four to forty-eight hours, Gallagher instructed Blackwell to tell Rodrian that Tower would not backdate Trinity's coverage. It is Trinity's position that Gallagher did nothing to investigate Tower's duty to Trinity before making his decision and that this non-investigation among other things constituted bad faith on Tower's part. Trinity points out that Gallagher made his decision without ever contacting

Tower's in-house attorney for advice on the matter and without ever contacting Trinity to verify Rodrian's representation.

¶ 9. Gallagher's decision was memorialized in a handwritten note to Blackwell:

> Carol-Your referral says that this is agency error and not ours. We didn't get request to provide [hired and non-owned coverage] didn't get copy of binder till now, so [we] don't have any reason to backdate. Suggest agent [Jim Rodrian] alert his E and O carrier if he hasn't already. I'm not going to put backdate and add with uncertainty as to possible exposure. We could be facing big dollars due to liab[ility]?? If you want to discuss further let me know. Gene

Thereafter, Blackwell met with Rodrian on February 2, 1995, to inform him of Tower's decision.

¶ 10. After its decision, Gallagher and Tower were asked on numerous occasions to reconsider. Notably, one of these requests for reconsideration came in the form of a letter mailed to Gallagher by Jim Reynolds, the adjuster at Rodrian's Errors and Omissions (E&O) carrier (J. Soukup & Co., Inc., an insurance claim investigation and adjustment firm). This letter included a citation to *Trible v. Tower Insurance Co.*, 43 Wis. 2d 172, 168 N.W.2d 148 (1969) (the lead case instructing when a claim for reformation of an insurance policy is warranted). Gallagher did not read the case. Tower did not change its decision.

¶ 11. Three years after the accident, the involved parties began filing suit. Tower undertook the representation of Trinity under a reservation of rights. Tower retained counsel to represent Trinity on the issue of liability. Tower also retained its own attorney, Arnold Anderson. On May 18, 1998, Tower, through Anderson, filed a motion for summary judgment asking

to be dismissed as a party in the case entirely. Tower stated: "[T]he contract of insurance it issued to Trinity does not cover the claims stated in the complaint. Specifically, the policy does not cover claims arising out of the operation of a motor vehicle." Tower did not conduct discovery prior to filing the motion for summary judgment. Tower requested summary judgment solely on the basis of the language of the written policy. Its motion did not bring to the court's attention that it had been informed by its agent that the written policy was in error, that its agent had requested that the policy be backdated, and that it had denied its agent's request for backdating.

¶ 12. In response to Tower's motion for summary judgment, Trinity hired an attorney to represent it on the question of insurance coverage and filed an action for reformation and breach of contract. Shortly thereafter, Tower withdrew its motion for summary judgment.

¶ 13. On September 28, 1998, Trinity deposed Fischer, the Tower underwriter who dealt with Rodrian in regard to Trinity's policy. During the course of Fischer's deposition, Trinity discovered that in June 1995, four months after Blackwell had met with Rodrian to inform him of Tower's decision, an investigator hired by Rodrian had tracked down Fischer and obtained a signed statement from him verifying that Rodrian had indeed asked Fischer to include hired and non-owned automobile coverage in Trinity's policy. Two days after Trinity deposed Fischer, Tower stipulated to reform Trinity's policy to include non-owned and hired coverage at the time of the accident. Tower also paid approximately $490,000 to discharge Trinity's liability in its entirety in the underlying accident suit.

¶ 14. Tower's stipulation to reform Trinity's policy and its payout to discharge Trinity's liability did not settle the controversy. Given the information provided by Fischer, Trinity amended its cross-claim to assert a bad faith cause of action against Tower. In response, Tower filed a motion for summary judgment seeking dismissal of the bad faith claim. In its written decision on Tower's motion, the trial court determined that Trinity was entitled to reformation of the insurance policy as a matter of law. The trial court further concluded that Tower's conduct constituted bad faith under the standard set forth in *Anderson v. Continental Insurance Co.*, 85 Wis. 2d 675, 691, 271 N.W.2d 368 (1978), and accordingly granted summary judgment for Trinity pursuant to Wis. Stat. § 802.08(6) (1999–2000).[1]

¶ 15. Subsequent to the trial court's decision, the only factual issue left for determination by the jury was whether punitive damages attached. After hearing several days of testimony, including testimony from Gallagher that he had no knowledge of principal/agency law, the law of reformation, Wisconsin's Unfair Claims Practices Act, or *Trible*, the jury determined that Tower had acted "in an intentional disregard of the rights of the plaintiff" awarding $3,500,000 in punitive damages to Trinity. Tower's numerous motions after verdict were denied and judgment was entered on the verdict on March 15, 2001. It is from this final judgment that Tower appeals.

## Law and Analysis

¶ 16. At the outset, we note that an analysis on reformation is not necessary because that issue has

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

been settled in the lower court. Tower agreed to reform the policy; additionally, the trial court held that as a matter of law, Tower had to reform the policy.

### Bad Faith

¶ 17.   First we will dispose of Tower's argument that bad faith cannot exist in the context of reformation. Tower cites *Combined Investigative Services, Inc. v. Scottsdale Insurance Co.*, 165 Wis. 2d 262, 270–71, 477 N.W.2d 82 (Ct. App. 1991), and *Kranzush v. Badger State Mutual Casualty Co.*, 103 Wis. 2d 56, 60–62, 307 N.W.2d 256 (1981), to support its argument that Wisconsin has not recognized bad faith claims in reformation cases. Tower contends that the trial court improperly expanded the scope of bad faith liability in the reformation context. We do not agree.

¶ 18.   *Combined* and *Kranzush* explain that claims for bad faith have generally been limited to (1) an injured's action against the tortfeasor's insurer; (2) an insured's action against its own insurer's handling of its claim under a casualty, life, health, or accident policy; and (3) a third party's action against the insurer for failure to reimburse a worker's compensation claim. *Combined*, 165 Wis. 2d at 269–70; *Kranzush*, 103 Wis. 2d at 60–62. Trinity's bad faith action falls into the second accepted category. Trinity's cross-claim for bad faith is an insured's action against its own insurer's handling of its claim under an accident policy. *See Kranzush*, 103 Wis. 2d at 61. Thus, contrary to Tower's assertion, the trial court did not expand the tort of bad faith into other areas of the law in its recognition of Trinity's bad faith claim.

231

¶ 19. Nonetheless, we conclude that the trial court erred when it granted summary judgment in favor of Trinity on the issue of bad faith. When reviewing a grant of summary judgment, we apply the standards set forth in Wɪꜱ. Sᴛᴀᴛ. § 802.08, just as the trial court applies those standards. *Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625 (1991). Under § 802.08(2), summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Our first step in the summary judgment methodology is to discern whether the pleadings set forth a claim for relief as well as a material issue of fact. *Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473, (1980). If the pleadings meet this initial test and our review of the record shows that the moving party has made a prima facie case for summary judgment, we examine the record to discern whether there "exist disputed material facts, or undisputed material facts from which reasonable alternative inferences may be drawn, sufficient to entitle the opposing party to a trial." *Id.*

¶ 20. In the present case, the pleadings of Tower set forth a claim for relief as well as material issues of fact. Tower alleged in its complaint that Trinity's claim of bad faith was without merit; that Tower had a reasonable basis to deny claims arising out of the underlying accident; and finally, that Tower did not breach any contractual duty and was not negligent in any way. Tower also alleged a variety of facts to support

232

its three reasons for summary judgment. Therefore, Tower has overcome the first hurdle in the summary judgment analysis.

■

¶ 21.   Our analysis now shifts to whether there existed any disputed material facts. Both Tower and Trinity contend that there are disputed facts and while they each do so at self-serving junctures in the timeline of this case,[2] our review of the record confirms that a dispute existed and summary judgment was inappropriate. Trinity claimed (in its brief in opposition to Tower's motion for summary judgment on the bad faith issue) that there existed material issues of fact that ought to go to a jury. Trinity argued, "Tower misrepresents the facts when it claims that, prior to the commencement of the lawsuit, Trinity did not request reformation nor present any evidence to establish entitlement to reformation." Trinity claimed that Tower's argument that Trinity did not request reformation or present any evidence to establish entitlement to reformation requires a factual finding from the court regarding what information was known by or available to Tower immediately after the automobile accident in January 1995. Trinity requested that the court leave it to a jury, in its role as fact finder, to determine the facts surrounding Tower's knowledge at the time of denial. On appeal, Tower renews Trinity's assertion that there existed disputed facts which precluded summary judgment, stating, "Trinity also argued that there was ample

[2] Trinity argues that there are disputed facts in its trial brief in opposition to Tower's motion for summary judgment on Trinity's bad faith claim. Tower, on appeal and with the knowledge that the trial court granted summary judgment *against* it on the bad faith issue, *agrees* with Trinity that there are facts in dispute.

evidence precluding Tower's motion for summary judgment, and that the bad faith issue should be left to the jury." We agree with the parties that the facts related to what Tower actually knew and thus whether there was intentional disregard are in dispute. We therefore find that there were material facts in dispute, making summary judgment inappropriate.

¶ 22.  Because the bad faith issue should have been left to the jury, our bad faith discussion is meant to assist the parties and the trial court on remand. Wisconsin's law on an insurer's duty to avoid bad faith is well developed.

> [I]n every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is imminent in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.

*Anderson*, 85 Wis. 2d at 689. By entering into an insurance contract and taking control of settlement or litigation, the insurer assumes a fiduciary duty on behalf of the insured. *Prosser v. Leuck*, 225 Wis. 2d 126, 138, 592 N.W.2d 178 (1999). Because the insured has given up something of value to the insurer—namely, the right to defend and settle a claim—the insurer has been said to be in the position of a fiduciary with respect to an insured's interest in settlement of a claim. *Id.*

¶ 23.  The fiduciary duty "carries with it the duty to act on behalf of the insured and to exercise the same standard of care that the insurance company would

exercise were it exercising ordinary diligence in respect to its own business." *Id.* The fiduciary duty imposes several obligations on the insurer. This includes the duty to *diligently investigate* to ascertain facts upon which to base a good faith decision whether to settle. *Id.* The insurer must fulfill this obligation as part of its fiduciary duty even if it challenges coverage. *Id.* at 139.

¶ 24.   In order to succeed on a claim of bad faith, the insured must show (1) an absence of a reasonable basis for denying the policy benefits and (2) the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. *Anderson,* 85 Wis. 2d at 691. An absence of a reasonable basis for denying the claim exists when the claim is not fairly debatable. *Mowry v. Badger State Mut. Cas. Co.,* 129 Wis. 2d 496, 516, 385 N.W.2d 171 (1986). Once again, in applying this test, it is appropriate to determine "whether a claim was *properly investigated* and whether the results of the investigation were subjected to a reasonable evaluation and review." *Anderson,* 85 Wis. 2d at 692 (emphasis added). Recently, the supreme court reiterated this mandate in *Danner v. Auto-Owners Ins.,* 2001 WI 90, 245 Wis. 2d 49, 629 N.W.2d 159. In *Danner,* the insured sued her underinsured carrier, claiming failure to exercise good faith in the investigation, evaluation and processing of a claim. *Id.* at ¶ 2. The insurer asked the court to narrowly interpret the good faith duty to investigate, arguing that there can be no bad faith claim against a UIM carrier for the investigation, evaluation or processing of a claim until arbitration established the company's legal obligation to pay. *Id.* at ¶ 43. The court rejected this argument, holding that every insurance contract from

its inception has an implied covenant of good faith and fair dealing between the insured and insurer. *Id.* at ¶ 57.

¶ 25.    However, when a claim is "fairly debatable," the insurer is entitled to debate it. *Drake v. Milwaukee Mut. Ins. Co.*, 70 Wis. 2d 977, 984, 236 N.W.2d 204 (1975). In *Drake*, it was determined that "there was a genuine dispute over the status of the law at the time the denials were made, and it cannot be said that the company's denials were made in bad faith." *Id.* It is apparent then that the insurer is entitled to debate a fairly debatable claim regardless of whether the debate concerns a matter of fact *or law*. Nonetheless, the tort of bad faith can be alleged only if the facts pleaded would, on the basis of an objective standard, show the absence of a reasonable basis for denying the claim; *i.e.,* would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances. *Anderson*, 85 Wis. 2d at 692. So whether a claim is "fairly debatable" additionally implicates the question of whether the facts necessary to evaluate the claim were properly investigated and developed or recklessly ignored and disregarded. *Id.* at 691.

¶ 26.    The law of reformation which obliges the insurance company to reform a contract where the insured has shown by clear and convincing evidence that there was a mutual mistake in the policy is unquestioned. *See Trible,* 43 Wis. 2d at 182. Under no view of the applicable law is an insurer's reformation obligation "fairly debatable." The trial court found that a mutual mistake occurred and that reformation was in order. Tower does not appeal this finding. Moreover,

Tower had already agreed to reform the policy before the trial court held that it was obligated to do so. What is at issue is whether Tower acted in bad faith prior to its acquiescence to reformation.

¶ 27.  The tort of bad faith is an intentional one. *Anderson*, 85 Wis. 2d at 691. "Bad faith" by definition cannot be unintentional. *Id.* Bad faith is the absence of honest, intelligent action or consideration based upon knowledge of the facts and circumstances upon which a decision in respect to liability is predicated. *Id.* at 692. There is a duty of ordinary care and reasonable diligence on the part of an insurer in handling claims, and the knowing failure to exercise an honest and informed judgment constitutes bad faith. *Id.* In short, it is proper when applying the bad faith test, to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review; this will be the jury's task on remand.

### Punitive Damages

¶ 28.  With regard to the punitive damages award, we uphold the award *if* on remand the jury finds bad faith. We recognize that in order to discuss our decision to uphold the punitive damages award we must assume arguendo that bad faith was properly found. Our analysis will reflect the assumption that bad faith exists. However, if the jury *does not* find bad faith, the punitive damages award is nullified.

¶ 29.  Proof of a bad faith cause of action does not necessarily make punitive damages appropriate. *Id.* at 697. There is a distinction between the intent necessary

to maintain an action for bad faith and the intent that must be shown to recover punitive damages. *Id.* For punitive damages to be awarded in addition to compensatory damages for the tort, there must be a showing of an evil intent deserving of punishment or of something in the nature of special ill-will or wanton disregard of duty or gross or outrageous conduct. *Id.*

¶ 30.   Tower argues that the trial court erred as a matter of law by submitting punitive damages to the jury. Before the question of punitive damages in a tort action can properly be submitted to the jury, the trial court must determine, as a matter of law, that the evidence will support an award of punitive damages. *Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 614, 563 N.W.2d 154 (1997). A question on punitive damages may not be given to the jury unless the trial court concludes that a reasonable jury could find from the evidence that entitlement to punitive damages has been proven by clear and convincing evidence. *Lievrouw v. Roth*, 157 Wis. 2d 332, 344, 459 N.W.2d 850 (Ct. App. 1990). Whether there is sufficient evidence to submit a punitive damages question to the jury is a legal matter that an appellate court must determine independently. *Id.* "The plaintiff may receive punitive damages if evidence is submitted. showing that the defendant acted maliciously toward the plaintiff *or in an intentional disregard* of the rights of the plaintiff." WIS. STAT. § 895.85(3) (emphasis added). The law requires that we view the evidence in a light most favorable to the jury's verdict. *Fehring v. Republic Ins. Co.*, 118 Wis. 2d 299, 305–06, 347 N.W.2d 595 (1984), *overruled on other grounds by DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 547 N.W.2d 592 (1996). Upon our independent review of the record, we hold that Trinity supplied

238

credible evidence to show that Tower acted in an intentional disregard of Trinity's rights; this showing is enough to support the submission of punitive damages to the jury.

¶ 31.    Tower additionally contends that the punitive damages verdict was not obtained through a fair process and that the ends of justice warrant a new trial. This contention is based on Tower's belief that the trial court erred in allowing Trinity to present to the jury improper opinion testimony of economist Robert Niendorf. Tower claims that Niendorf included Tower's parent company's (Atlas) finances in assessing what amount Tower could afford to pay in punitive damages. Tower says that under Wisconsin law, punitive damages cannot be based on the assets of a nonparty parent corporation. We need not verify this because, for our purposes, even assuming Tower has stated Wisconsin law correctly, contrary to Tower's assertion, Niendorf's testimony did not include improper information about Tower's parent company.

¶ 32.    Niendorf's testimony was admitted via videotape deposition. From our reading of his testimony, it did not inform the jury of the financial resources of Atlas. The trial court redacted any reference to Atlas's assets from Niendorf's testimony before it was presented to the jury. Niendorf's testimony did not reference the financial wealth of Atlas. It does not appear that Niendorf's theories regarding Tower's ability to pay relied on the financial well-being of Atlas. And finally, each source of money listed as available to satisfy a punitive damages judgment was totally internal to the financial assets of Tower. We hold that the process was untainted by Niendorf's testimony.

¶ 33. Finally, Tower argues that the punitive damages verdict violates due process and Wisconsin public policy. Punitive damages may properly be imposed to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). The award of punitive damages in a particular case is entirely within the discretion of the jury. *Jacque*, 209 Wis. 2d at 626. However, we apply a de novo standard of review when passing on a trial court's determination of the constitutionality of punitive damages awards. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 121 S. Ct. 1678, 1685–86 (2001). Only when an award can fairly be categorized as "grossly excessive" in relation to the state's interests in punishment and deterrence does it enter the zone of arbitrariness that violates due process. *Jacque*, 209 Wis. 2d at 627. The test for "gross excessiveness" stems from an elementary notion of fairness that a party receive fair notice not only of the conduct that will subject it to punishment, but also of the severity of the penalty that a state may impose. *BMW*, 517 U.S. at 574. The test has three parts:  (1) the degree of reprehensibility of the conduct, (2) the disparity between the harm or potential harm suffered and the punitive damages award, and (3) the difference between the punitive damages and the possible civil or criminal penalties imposed for the conduct. *Id.* at 575.

¶ 34.   Thus, we focus first on the scope of the state's legitimate interests in punishing Tower and deterring it from future misconduct. *See id.* If we find that the punitive damages award accomplishes these interests, we then turn to the factors in the *BMW* test and weigh them against the state's interest in punishment and deterrence. *See Jacque*, 209 Wis. 2d at 627.

240

¶ 35. As an insurance company in Wisconsin, Tower has an implied duty of good faith and fair dealing and our law has developed such that this duty encompasses the obligation to investigate disputed coverage claims. *Prosser*, 225 Wis. 2d at 138. The state has a legitimate interest in deterring Tower from burying its proverbial head in the sand only to later claim ignorance of what this duty entails. We find that the $3,500,000 dollar punitive damages award against Tower well serves the legitimate interest of punishment and deterrence. Certainly Tower will feel the effect of this sanction, but that is the point of punishment. Moreover, as a result of this punishment, Tower will very likely become schooled in its duty as an insurer in order to protect itself from making the same costly mistake in the future.

¶ 36. Because we conclude that the punitive damages award accomplishes the legitimate state interests of punishment and deterrence, we now weigh the factors in the *BMW* test against these interests. *See Jacque*, 209 Wis. 2d at 627. We turn first to the reprehensibility factor. "The most important indicium of the reasonableness of a punitive damage award is the degree of reprehensibility of the defendant's conduct." *Id.* at 628. In addressing the reprehensibility of Tower's conduct, it is appropriate to consider evidence that suggests that Tower engaged in prohibited conduct while *knowing or suspecting* that it was unlawful. *See BMW*, 517 U.S. at 576. And if this is the case, then strong medicine is required to cure this type of disrespect for the law. *Id.* at 576–77. Punitive damages should reflect the egregiousness of the offense. *Jacque*, 209 Wis. 2d at 628.

241

¶ 37. Bear in mind that when we review the record to determine whether a punitive damages award is excessive, the evidence must be viewed in the light most favorable to the plaintiff, and a jury's punitive damages award will not be disturbed unless the verdict is so clearly excessive as to indicate passion and prejudice. *Id.* at 626–27. Thus, when viewing the evidence in this light, the offense in this case was Tower's intentional disregard of its duty to diligently investigate to ascertain facts and circumstances underlying the accident upon which to base a good faith decision to settle or determine coverage. *See Prosser*, 225 Wis. 2d at 138.

¶ 38. Gallagher's decision to deny coverage within twenty-four to forty-eight hours without knowing whether Trinity had actually requested hired and non-owned automobile coverage and without contacting Trinity to determine this shows an intentional disregard toward Tower's insured. Gallagher's decision not to seek the available in-house legal counsel regarding Rodrian's requests for backdating shows a reckless disregard toward Tower's insured. Gallagher's decision not to contact Fischer, Tower's own underwriter with whom Rodrian worked on the Trinity policy, about whether he understood Trinity to have requested hired and non-owned coverage shows a reckless disregard toward Trinity in the face of its agent's representation that Trinity had requested coverage. Tower's decision to send its attorney to the court and ask for summary judgment without ever informing the court of the dispute regarding Rodrian's error and request for backdating shows blatant disrespect for its insured and the court. We have no trouble concluding that the reprehensibility factor has been met under *BMW*.

¶ 39. We now turn to the second factor: the disparity between the harm or potential harm suffered by Trinity and the punitive damages award. *See Jacque,* 209 Wis. 2d at 628–29. When compensatory damages are awarded, we consider the ratio of the compensatory to punitive damages. *Id.* at 629. This is so because compensatory damages represent the actual harm inflicted on the plaintiff. *Id.* Wisconsin law expressly rejects the use of a fixed multiplier, either a fixed ratio of compensatory to punitive damages or of criminal fine to punitive damages, to calculate the amount of reasonable punitive damages. *Id.* However, in the appropriate case, a comparison of the compensatory damages and the punitive damages award is important. While a constitutional line ought not be marked by a simple mathematical formula, the proportionate rule for punitive damages is one factor in determining the reasonableness of the punitive damages award. *Id.*

¶ 40. At trial, both parties were given the opportunity to introduce evidence and argue on this issue. Tower introduced evidence that the only potential damage in this case was $17,000; Trinity introduced evidence of a potential harm of $490,000 had Tower succeeded in its summary judgment requesting to be dismissed entirely from the case.[3] The punitive damages award represents a 7:1 ratio of punitive damages to compensatory damages accepting Trinity's position.

---

[3] We note again that it was stipulated between the parties prior. to trial that the total payments made to the injured parties, along with attorneys' fees incurred in the defense of the action, amounted to $490,000.

We cannot say that this is an unreasonable or constitutionally impermissible award. *See id.* at 626–27.

■■■■■

¶ 41.   Finally, we turn to the third factor:   a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. *Id.* at 630. We consider this factor "largely irrelevant" to the case at hand. *See id.* The legislature has not put into place a criminal or civil statute prohibiting insurance carriers from intentionally disregarding the contractual rights of an insured and rejecting claims on the basis of their own economic self-interest. Thus, as our supreme court held in *Jacque*, when a legislature has not prescribed penalties for the type of conduct engaged in by the defendant, this third guidepost becomes immaterial. *Id.*

¶ 42.   Having examined the state's legitimate interests in punishing Tower and deterring it from future misconduct along with the factors in the *BMW* test, if the jury finds bad faith on remand, we uphold the jury's verdict awarding Trinity punitive damages in the amount of $3,500,000.

*By the Court.*—Judgment reversed and cause remanded with directions.