Trinity Evangelical Lutheran Church and School-Freistadt, Plaintiff-Respondent-Cross Petitioner,

v.

Tower Insurance Company, Defendant-Appellant-Petitioner.†

Supreme Court

*No. 01–1201. Oral argument December 4, 2002.—Decided May 23, 2003.*

2003 WI 46

(Also reported in 661 N.W.2d 789.)

† Motion for reconsideration denied 7-1-03.

For the defendant-appellant-petitioner there were briefs by *M. Christine Cowles, Barbara A. O'Brien*, and *Borgelt, Powell, Peterson & Frauen, S.C.,* Milwaukee, and *Edward M. Crane, Charles F. Smith,* and *Skadden, Arps, Slate, Meagher & Flom,* Chicago, Illinois, and oral argument by *Charles F. Smith.*

For the plaintiff-respondent-cross petitioner there were briefs by *Merrick R. Domnitz, Robert L. Jaskulski,* and *Domnitz, Mawicke & Goisman, S.C.,* Milwaukee, and oral argument by *Robert L. Jaskulski* and *Merrick R. Domnitz.*

An amicus curiae brief was filed by *William C. Gleisner, III,* Madison, and *R. George Burnett* and *Liebmann, Conway, Olejniczak & Jerry, S.C.,* Green Bay, on behalf of the Wisconsin Academy of Trial Lawyers.

An amicus curiae brief was filed by *John W. Markson* and *Bell Gierhart & Moore, S.C.,* Madison, on behalf of the Civil Trial Counsel of Wisconsin.

¶ 1. N. PATRICK CROOKS, J.   This case involves an insurance action where, as a result of mistake, the insurance policy failed to provide hired and non-owned automobile coverage that the insured requested. After Tower Insurance Company (Tower) learned of the mis-

338

take, it failed in its duty to its insured, Trinity Evangelical Lutheran Church and School-Freistadt (Trinity) to investigate properly and evaluate reasonably. It initially refused to backdate coverage when the error was discovered after an accident occurred. The pivotal dispute in this case centers on what Tower should have done once it became aware of the mistake.

¶ 2. The circuit court, the Honorable Marianne E. Becker presiding, determined that Trinity was entitled to reformation of the insurance policy as a matter of law. The circuit court further concluded that Tower's conduct constituted bad faith under the standard set forth in *Anderson v. Continental Insurance Co.*, 85 Wis. 2d 675, 691, 271 N.W.2d 368 (1978), and accordingly granted summary judgment to Trinity pursuant to Wis. Stat. § 802.08(6) (1999–2000).[1] A jury trial was then held on the issue of damages, and $3,500,000 in punitive damages were awarded to Trinity. Tower's motions after verdict were denied, and judgment was entered on the verdict on March 15, 2001.

¶ 3. The court of appeals upheld the punitive damages award of $3,500,000 by applying a de novo standard of review and a "gross excessiveness test." The decision by the court of appeals was made contingent on a trial with a finding of bad faith. The court of appeals found that there were genuine issues of material fact on the claim of bad faith, and therefore it reversed the circuit court's grant of summary judgment on that claim.

¶ 4. Two issues must be resolved. First, whether the court of appeals was correct in reversing summary judgment on the bad faith claim, and second, what

---

[1] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

standard of review should be applied when an appellate court reviews a jury's punitive damages award. We must also determine, applying the relevant factors, whether the jury award of $3,500,000 in punitive damages should be upheld.

¶ 5. We conclude that the circuit court properly granted summary judgment on the issue of bad faith. We also hold that the appropriate standard of review to be applied in reviewing a punitive damage award is de novo review, and that when the relevant factors are considered, the punitive damages award should be allowed to stand. Therefore, we reverse, in part, the court of appeals' decision on the grant of summary judgment, but we affirm its decision upholding the award of punitive damages.

## I. FACTS

¶ 6. Trinity Evangelical Church and School (Trinity) offers religious services as well as a grade school to approximately 234 grade school age children in Mequon, Wisconsin. In 1994, Trinity was interested in renewing its hired and non-owned automobile insurance coverage that it carried, because its teachers had occasion to transport students to and from certain functions in the course of their employment using their own vehicles.

¶ 7. Trinity sought renewal quotations from various carriers including Tower Insurance Company (Tower) who was represented by their agent Jim Rodrian (Rodrian). Trinity explained to Rodrian its need for hired and non-owned coverage. Rodrian then passed this information on to Harold Fischer (Fischer), an underwriter at Tower. Fischer gave Rodrian a quote, which Rodrian believed included the requested cover-

age, and Rodrian subsequently provided the quote to Trinity, who accepted it, believing it would be covered for hired and non-owned automobiles.

¶ 8. On February 10, 1994, Rodrian sent Trinity's pre-application binder, which included information on this requested form of coverage. However, Rodrian inadvertently failed to check the hired and non-owned box on Trinity's insurance application. Tower issued the policy without any of the parties involved being aware of the omission of the requested coverage.

¶ 9. On January 24, 1995, Lorrie Erdman, a teacher at Trinity, while transporting students from the school in the course of her employment, using her own vehicle, ran a stop sign and collided with another vehicle. The collision resulted in serious injuries to the other vehicle's driver and passenger.

¶ 10. Trinity notified Rodrian of the potential claim. Upon review of the policy, Rodrian discovered his omission. Rodrian drafted a letter to Carol Blackwell (Blackwell), a district manager in Tower's underwriting department, dated January 31, 1995, informing Tower of the accident and of the fact that he mistakenly failed to request hired and non-owned automobile coverage on the application. Rodrian also requested that Tower backdate Trinity's coverage.

¶ 11. In response to Rodrian's letter, Blackwell drafted a memo to Gene Gallagher, the vice president and director of operations at Tower. Blackwell's memo summarized the circumstances surrounding Rodrian's error, and asked for direction as to how to handle Rodrian's request to backdate coverage.

¶ 12. Within twenty-four to forty-eight hours, Gallagher instructed Blackwell to inform Rodrian that Tower would not backdate Trinity's coverage.[2]

¶ 13. Gallagher sent a handwritten note to Blackwell, which describes his decision:

> Carol—Your referral says that this is agency error and not ours. We didn't get request to provide [hired and non-owned coverage] didn't get copy of binder till now, so [we] don't have any reason to backdate. Suggest agent [Jim Rodrian] alert his E and O carrier if he hasn't already. I'm not going to put backdate and add with uncertainty as to possible exposure. We could be facing big dollars due to liab[ility]?? If you want to discuss further let me know. Gene

On February 2, 1995, Blackwell met with Rodrian to inform him of Tower's decision not to backdate coverage.

¶ 14. Thereafter, Tower was asked on several occasions to reconsider its position. One request for reconsideration came from Jim Reynolds, the adjuster for Rodrian's Errors and Omissions (E & O) carrier. This letter, mailed to Gallagher, included a citation to *Trible v. Tower Insurance Co.*, 43 Wis. 2d 172, 168

---

[2] It is Trinity's position that Gallagher did nothing to investigate Tower's duty to Trinity before making his decision, and that this non-investigation, among other things, constituted bad faith on Tower's part. Trinity points out that Gallagher made his decision without ever contacting Tower's in-house attorney for advice on the matter, and without ever contacting Trinity to verify Rodrian's representation.

N.W.2d 148 (1969).[3] Gallagher did not read the case, and Tower did not change its decision.

## II. PROCEDURAL BACKGROUND

¶ 15. A suit arising out of the accident was filed in 1998. On May 18, 1998, Tower filed a motion for summary judgment asking to be dismissed as a party in the case. This motion was based solely on language of the written policy, and the motion failed to bring to the court's attention that Tower had been informed by its agent that the written policy was in error. Specifically, Tower failed to inform the court in its motion that its agent had requested the policy to be backdated and that Tower had denied the agent's request.

¶ 16. In response to Tower's motion for summary judgment, Trinity hired an attorney to represent it on the question of insurance coverage, and filed a cross-claim for reformation and breach of contract. Shortly thereafter, Tower withdrew its motion for summary judgment.

¶ 17. On September 28, 1998, Trinity deposed Fischer, the Tower underwriter who dealt with the insurance agent, Rodrian, in regard to Trinity's policy.

[3] *Trible* is the seminal case in Wisconsin addressing the obligation of an insurer to reform an insurance contract upon the discovery of a mutual mistake in the issuance of the written policy. The facts of *Trible* are nearly identical to the facts presented to Tower at the time it denied coverage to Trinity. *Trible* involved an insurance agent tied to an insurer via an agency contract. There was an error in requesting coverage, thereby creating a "mutual mistake" (*see* note 4), and the insurer later discovered that the insured had, in fact, requested the coverage. This court in *Trible* concluded that reformation of the erroneous insurance policy was appropriate. It is also important to note that Tower was the defendant in *Trible v. Tower Insurance Co.,* 43 Wis. 2d 172, 168 N.W.2d 148 (1969).

During Fischer's deposition, Trinity discovered that in June 1995, four months after Blackwell had met with Rodrian to inform him of Tower's decision, an investigator hired by Rodrian had tracked down Fischer and obtained a signed statement from him. The statement made it clear that Rodrian had indeed asked Fischer to include hired and non-owned automobile coverage in Trinity's policy.

¶ 18. Two days later, Tower stipulated to reform Trinity's policy to include non-owned and hired coverage at the time of the accident. Tower also paid approximately $490,000 to discharge Trinity's liability in its entirety in the underlying accident suit. Trinity subsequently amended its cross-claim to assert a bad faith cause of action against Tower.

¶ 19. In response, Tower filed a motion for summary judgment seeking dismissal of the bad faith claim. In a written decision, the Circuit Court of Waukesha County, Honorable Marianne E. Becker presiding, held that Trinity was entitled to reformation of the insurance policy as a matter of law. The circuit court additionally found that Tower's conduct constituted bad faith under the standard set forth in *Anderson v. Continental Insurance Co.*, 85 Wis. 2d 675, 691, 271 N.W.2d 368 (1978), and accordingly granted summary judgment for Trinity pursuant to Wis. Stat. § 802.08(6).

¶ 20. Following the circuit court's decision, the only factual issue left for determination by a jury was whether punitive damages should be awarded. After several days of testimony, including testimony from Gallagher that he had no knowledge of principal/agency law, the law of reformation, Wisconsin's Unfair Claims Practices Act, or the *Trible* case, the jury determined

that Tower had acted "in an intentional disregard of the rights of the plaintiff" awarding $3,500,000 in punitive damages to Trinity.

¶ 21.  Tower's motions after verdict were denied and judgment was entered on the verdict on March 15, 2001. Tower appealed.

¶ 22.  The court of appeals upheld the punitive damages award of $3,500,000 by applying a de novo standard of review and a "gross excessiveness test." This decision by the court was made contingent on a trial with a finding of bad faith. The court of appeals held that the circuit court erred in granting summary judgment on the bad faith claim.

¶ 23.  Tower petitioned for review on the punitive damages award, and Trinity cross-petitioned on the bad faith claim. Review was granted on September 3, 2002.

¶ 24.  As previously noted, this court must determine whether the court of appeals was correct in reversing the grant of summary judgment on the bad faith claim, and what standard of review should be applied when an appellate court reviews a punitive damages award.

¶ 25.  When reviewing a grant of summary judgment, the appellate court applies the same standards set forth in Wis. Stat. § 802.08 as the circuit court applies. *Voss v. City of Middleton,* 162 Wis. 2d 737, 748, 470 N.W.2d 625 (1991).

¶ 26.  It is argued by Tower and by Trinity that when reviewing a circuit court's decision regarding a punitive damages award, the appellate court should apply a de novo standard. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 435–36 (2001); *BMW of N. Am., Inc. v Gore,* 517 U.S. 559 (1996).

¶ 27.  Tower argues that the appellate court erred in upholding a punitive damages award that was pre-

mised on a bad faith finding that was later reversed. In support of its position, Tower maintains that the bifurcation of the bad faith issue and the punitive damages issue prejudices Tower and runs counter to established practice in Wisconsin. In addition, Tower argues that the appellate court erred in upholding a grossly excessive punitive damages award.

¶ 28.  Trinity, on the other hand, asks this court to affirm the circuit court's decision granting summary judgment on the bad faith issue. Trinity argues that the circuit court properly analyzed and applied Wisconsin's bad faith law. However, Trinity asks that this court affirm the court of appeals' decision upholding the punitive damages award. Trinity argues that upon a de novo review of the facts of this case, it is clear that the punitive damages award is not in violation of due process, nor is it excessive.

### III. BAD FAITH CLAIM

¶ 29.  First, we turn to the question of whether the circuit court properly granted summary judgment on the claim of bad faith. We hold that, based on the facts of this case, only one reasonable inference can be drawn—Tower acted with bad faith toward its insured, Trinity. Consequently, we reverse the court of appeals' decision that reversed the grant of summary judgment on that claim.

¶ 30.  As noted above, when reviewing a grant of summary judgment, we apply the standards set forth in Wis. Stat. § 802.08. *Robinson v. City of West Allis*, 2000 WI 126, ¶ 26, 239 Wis. 2d 595, 619 N.W.2d 692; *Voss*, 162 Wis. 2d at 748.

¶ 31.  Under Wis. Stat. § 802.08(2), summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on

346

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

¶ 32.   Therefore, the first step in the summary judgment review analysis is to determine whether the pleadings set forth a claim of relief. *Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980). Next, if the pleadings meet this initial test, and our review of the record shows that the moving party has made a prima facie case for summary judgment, we examine the record to determine whether there "exist[s] disputed material facts, or undisputed material facts from which reasonable alternative inferences may be drawn, sufficient to entitle the opposing party to a trial." *Id.*

¶ 33.   *Anderson* sets forth the elements of bad faith. *Anderson,* 85 Wis. 2d at 691. First, an insured must show absence of a reasonable basis for denying policy benefits. *Mowry v. Badger State Mut. Cas. Co.,* 129 Wis. 2d 496, 516, 385 N.W.2d 171 (1986). Absence of a reasonable basis for denying a claim exists when the claim is not "fairly debatable." *Id.* The "fairly debatable" test requires a claim to be investigated properly and the results of that investigation to be subject to reasonable evaluation and review. *Anderson,* 85 Wis. 2d at 692.

¶ 34.   According to *Anderson,* an insured must show "the absence of a reasonable basis for denying benefits of the policy" and the insurer's "knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id.* at 691. "[B]ad faith is the absence of honest, intelligent action or consideration

347

based upon a knowledge of the facts and circumstances upon which a decision in respect to liability is predicated." *Id.* at 692. There is a duty of ordinary care and reasonable diligence on the part of an insurer in handling claims, and it must exercise an honest and informed judgment. *Id.* We agree with the court of appeals: "In short, it is proper when applying the bad faith test to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review." *See Trinity Evangelical Lutheran Church v. Tower Ins. Co.,* 2002 WI App 46, ¶ 27, 251 Wis. 2d 212, 641 N.W.2d 504.

¶ 35. Applying the above rules to the facts of this case, the pleadings of Trinity set forth a claim for relief.

¶ 36. The court of appeals reviewed the record and determined that genuine issues of material fact were in dispute, making summary judgment on the bad faith claim inappropriate. *Trinity,* 251 Wis. 2d at 233. Specifically, the court said: "the facts related to what Tower actually knew and thus whether there was an *intentional* disregard are in dispute." *Id.* (emphasis added).

¶ 37. We disagree with the decision of the court of appeals. First, contrary to the test set forth by the court of appeals, Trinity was not required to make a showing of *intentional disregard* in order to succeed on a claim of bad faith. The appropriate test, as noted above, is whether the insurer acted with "knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Anderson,* 85 Wis. 2d at 691. While we note that *Anderson* does say that: "Bad faith by definition cannot be unintentional." The court of appeals, however, appears to have conflated the "intentional disre-

gard" standard required for punitive damages, with the "knowledge or reckless disregard" standard required for bad faith. *See id.*

¶ 38. Second, upon an independent review of the record, we conclude that the record in this case clearly indicates that the facts regarding what Tower knew were not in dispute at the time of the granting of summary judgment. While there may be some factual disputes, those disputes do not involve genuine issues of material fact. Indeed, the undisputed material facts in this case lead to only one reasonable inference—an inference of bad faith on the part of Tower. The *Anderson* court stated that "the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured." *Anderson,* 85 Wis. 2d at 693.

¶ 39. This case centers on what Tower should have done when it learned its agent made a mistake that adversely affected its insured, Trinity. Tower was put on notice by this court over 30 years ago, when it was the defendant in a nearly identical fact situation. *Trible,* 43 Wis. 2d 172. In this present case, Tower was reminded of that prior decision, but denied coverage nonetheless.

¶ 40. The following undisputed material facts illustrate Tower's reckless disregard toward its insured, Trinity. First, the record indicates that Tower, through its prior involvement as the defendant in the *Trible* case, should have understood its obligation to provide the requested coverage to an insured such as Trinity,

where a mutual mistake has occurred.[4] Second, the record indicates without dispute that Trinity lacked coverage due to a mutual mistake attributable to Tower's agent, Rodrian. The court of appeals recognized this undisputed fact. *See Trinity,* 251 Wis. 2d 212, ¶ 9.

¶ 41.   Next, it is undisputed, and recognized by the court of appeals, that Tower, via Gallagher, knew of this mutual mistake when it denied coverage to Trinity. *See id.* (citing to letter to Blackwell). Finally, there is no dispute that Trinity requested that its coverage be backdated, and the court of appeals recognized this undisputed fact. *See id.*

██

¶ 42.   It is clear that Tower, knowing of the mutual mistake, failed to take "honest, intelligent action or consideration based upon knowledge of the facts and circumstances" presented to it when it denied coverage

---

[4] It can be argued here that the mistake was unilateral rather than mutual given there was no error or mistake on the part of Trinity. Black's Law Dictionary defines a unilateral mistake as one-sided; relating to only one of two or more persons or things. *Black's Law Dictionary,* 1532 (7th ed. 1999).

However, the court in *Trible* and the circuit court and court of appeals in *Trinity* consistently refer to the "mistake" described here and in *Trible* as being a mutual mistake. For example, the court in *Trible* said:   "When a policy of insurance is involved, mutual mistake is proven when the party applying for insurance proves that he made certain statements to the agent concerning the coverage desired, but the policy as issued does not provide the coverage desired."

*Trible v. Tower Ins. Co.,* 43 Wis. 2d 172, 182, 168 N.W.2d 148 (1969); *See also, Trinity Evangelical Lutheran Church v. Tower Ins. Co.,* 2002 WI App 46, ¶ 26, 251 Wis. 2d 212, 641 N.W.2d 504.

to Trinity. *See Anderson,* 85 Wis. 2d at 692. Tower also failed to take such action or consideration when it failed to inform the court of Rodrian's error and his request for backdating. As a result, Tower failed to act in conformity with its duties.

¶ 43.   In light of the undisputed material facts set forth herein, we conclude that the only reasonable inference that can be drawn is that Tower acted in bad faith. As a result, we agree with the circuit court that summary judgment was appropriate here, and reverse the court of appeals' decision in that regard.

## IV. PUNITIVE DAMAGES AND THE STANDARD OF REVIEW

¶ 44.   We now turn to the issue of the punitive damages award. Tower argues that the appellate court erred in upholding a grossly excessive punitive damages award of $3,500,000 in violation of due process constraints. We disagree, and affirm the decision of the court of appeals upholding that award by the jury.

¶ 45.   Proof of a bad faith claim does not necessarily make the award of punitive damages appropriate. *Anderson,* 85 Wis. 2d at 697. The intent necessary to maintain an action for bad faith is distinct from what must be shown to recover punitive damages. *Id.; see also* Wis. Stat. § 895.85 (3). The factors necessary for an award of punitive damages, require a showing of: (1) evil intent deserving of punishment or of something in

the nature of special ill-will; or (2) wanton disregard of duty; or (3) gross or outrageous conduct. *Anderson,* 85 Wis. 2d at 697.[5]

[5] While the *Anderson* test is phrased somewhat differently than the standard jury instruction that was given on punitive damages, the jury instruction adequately covered the factors that the jury should have considered here. That instruction was as follows:

> Punitive damages may be awarded, if you find that the defendant acted in an intentional disregard of the rights of the plaintiff.
>
> A person acts in an intentional disregard of the rights of the plaintiff if the person acts with a purpose to disregard the plaintiff's rights, or is aware that his or her acts are practically certain to result in the plaintiff's rights being disregarded.
>
> The purpose of punitive damages is to punish a wrongdoer or deter the wrongdoer and others from engaging in similar conduct in the future. Punitive damages are not awarded to compensate the plaintiff for any loss he or she has sustained. A plaintiff is not entitled to punitive damages as a matter of right. Even if you find that the defendant acted in an intentional disregard of the plaintiff's rights, you do not have to award punitive damages. Such damages may be awarded or withheld at your discretion.
>
> If you determine that punitive damages should be awarded, you may then award such sum as will accomplish the purpose of punishing or deterring wrongful conduct.
>
> Factors you should consider in answering this question include:
>
> 1. The grievousness of the defendant's acts,
>
> 2. The potential damage which might have been done by such acts as well as the actual damage, and
>
> 3. The defendant's ability to pay. You may consider the defendant's wealth in determining what sum of punitive damages will be enough to punish the defendant and deter the defendant and others from the same conduct in the future.

¶ 46. Punitive damages may properly be imposed to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition. *BMW*, 517 U.S. at 568. According to Wisconsin law, the award of punitive damages in a particular case is within the discretion of the jury, and "[w]e are reluctant to set aside an award merely because it is large or we would have awarded less." *Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 626, 563 N.W.2d 154 (1997).

¶ 47. In *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001), the United States Supreme Court held that the Ninth Circuit Court of Appeals erred in applying the less demanding abuse-of-discretion standard when reviewing district court determinations of the constitutionality of an award of punitive damages. Instead, the United States Supreme Court determined that the constitutional issue of punitive damages merits de novo review. *Cooper*, 532 U.S. at 431. In reaching that conclusion, the Court said that the precise meaning of concepts like "gross excessiveness" is a fluid concept "that take their substantive content from the particular context[ ] in which the standard[ ] is being assessed." *Id.* at 436. The Court went on to say:

> "Independent review is therefore necessary if appellate courts are to maintain control of, and clarify, the legal principles." Again, this is also true of the general criteria set forth in *Gore;* they will acquire more meaningful content through case-by-case application at the appellate level. "Finally, de novo review tends to unify precedent" and " 'stabilize the law.' " . . . Justice Breyer made a similar point in his concurring opinion in *Gore:*
>
> "Requiring the application of law, rather than a ·decisionmaker's caprice, does more than simply provide

citizens notice of what actions may subject them to punishment; it also helps to assure the uniform treatment of similarly situated persons that is the essence of law itself."

*Id.*

¶ 48. Similarly, in Wisconsin, in *Management Computer Services,* this court held, in determining whether a jury's award was excessive, that the reviewing court properly reviewed the entire record "*ab inito*" or "de novo," placing no weight on the circuit court's conclusions. *See Management Computer Servs. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 192 n.32, 557 N.W.2d 67 (1996). We reached that conclusion because the circuit court set forth conclusory reasons for reducing a jury's punitive damages award of $1,750,000 to $650,000, and failed to analyze the evidence or set forth its own reasons for ordering remittitur with particularity. While *Management Computer Services* is a case involving remittitur, and therefore factually distinguishable, we nevertheless apply the reasons set forth in *Cooper* and extend the de novo review rule in *Management Computer Services* to apply to all situations, remittitur or otherwise, where there is a review of a punitive damages award. Therefore, building upon and extending the rule in *Management Computer Services,* we hold that a de novo standard of review is appropriate when reviewing a circuit court's determination of the constitutionality of punitive damages awards.

¶ 49. Although de novo review is the appropriate standard of review, we nevertheless acknowledge that the Due Process Clause of the Fourteenth Amendment imposes substantive limits on the size of a punitive

damages award. *Management Computer Servs.,* 206 Wis. 2d at 193. *See also Cooper,* 532 U.S. at 433.

■

¶ 50.   An award is excessive, and therefore violates due process, if it is more than necessary to serve the purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing. *Management Computer Servs.,* 206 Wis. 2d at 193 (citing *Tucker v. Marcus,* 142 Wis. 2d 425, 446, 418 N.W.2d 818 (1988); *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 303, 294 N.W.2d 437 (1980); *Fahrenberg v. Tengle,* 96 Wis. 2d 211, 234, 291 N.W.2d 516 (1980)). As noted by this court in previous decisions, the purpose of punitive damages is to punish the wrongdoer, and to deter the wrongdoer and others from similar conduct, rather than to compensate the plaintiff for any loss. *Id.* (citing *Wangen,* 97 Wis. 2d at 303; *Malco v. Midwest Aluminum Sales, Inc.,* 14 Wis. 2d 57, 64, 109 N.W.2d 516 (1961)). *See also Cooper* at 432 (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350 (1974)).

■

¶ 51.   In *Jacque,* we reiterated the decision of the United States Supreme Court in *TXO,* and held that only when an award can be fairly categorized as "grossly excessive," in relation to the state's interests in punishment and deterrence, does it enter the zone of arbitrariness that violates due process. *Jacque,* 209 Wis. 2d at 627 (citing *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 454 (1993)). Furthermore, the test for "grossly excessive[ness]" stems from a basic notion of fairness that a party should receive fair notice, not only of the conduct that will subject it to punishment, but also of the severity of the penalty that a state may impose. *BMW,* 517 U.S. at 574; *Jacque,* 209 Wis. 2d at 627.

¶ 52. Accordingly, in determining whether an award of punitive damages is excessive, the United States Supreme Court has applied a three-part test. The test asks the reviewing court to weigh: (1) the degree of egregiousness or reprehensibility of the conduct; (2) the disparity between the harm or the potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages and the possible civil or criminal penalties imposed for the conduct. *BMW*, 517 U.S. at 575; *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. ___, 123 S. Ct. 1513 (2003).[6]

¶ 53. When applying a virtually identical test, Wisconsin courts have been encouraged to consider, from the following, those factors which are most relevant to the case, in order to determine whether a punitive damages award is excessive:

1.    The grievousness of the acts;

2.    The degree of malicious intent;

---

[6] In a recent opinion, the United States Supreme Court reiterated the three-prong test of *Gore* and said:

> [W]e instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. We reiterated the importance of these three guideposts in *Cooper Industries* and mandated appellate courts to conduct *de novo* review of a trial court's application of them to the jury's award. Exacting appellate review ensures that an award of punitive damages is based upon an 'application of law, rather than a decisionmaker's caprice.'

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. ___, 123 S. Ct. 1513 (2003).

3. Whether the award bears a reasonable relationship to the award of compensatory damages;

4. The potential damage that might have been caused by the acts;

5. The ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct, and

6. The wealth of the wrongdoer.

*Management Computer Servs.,* 206 Wis. 2d at 194 (citing *BMW,* 116 S. Ct. at 1598–1600; *Tucker,* 142 Wis. 2d at 446–47; *Brown v. Maxey,* 124 Wis. 2d 426, 439, 369 N.W.2d 677 (1985); *Wangen,* 97 Wis. 2d at 302; *Dalton v. Meister,* 52 Wis. 2d 173, 180–81, 188 N.W.2d 494 (1971), *cert. denied,* 405 U.S. 934 (1972); *Malco,* 14 Wis. 2d at 66).

¶ 54. With the above rules in mind, we now turn to the facts of this case. As an insurance company doing business in Wisconsin, Tower has an implied duty of good faith and fair dealing, and our law has developed such that this duty encompasses the obligation to investigate properly and evaluate reasonably disputed coverage claims. *Prosser v. Leuck,* 225 Wis. 2d 126, 138, 592 N.W.2d 178 (1999). Here, the state has a legitimate interest in deterring insurance companies such as Tower from engaging in acts of bad faith. Furthermore, the state has an interest in deterring Tower, and others, from ignoring applicable decisions of this court as to its duty to its insured, and then later claiming ignorance of what such a duty entails. The $3,500,000 punitive damages award against Tower will serve the legitimate state interest in deterrence, as well as in punishment. Consequently, the punitive damages award will send a

message not only to Tower, but to other insurance companies as well, that ignoring its duties as an insurer is not acceptable and might very well result in substantial punitive damages.

¶ 55. Since we have determined that the punitive damages award accomplishes the legitimate state interests of punishment and deterrence, we now weigh the factors set forth in *BMW* against these interests. *See Jacque,* 209 Wis. 2d at 627.

¶ 56. However, the evidence must be viewed in the light most favorable to the plaintiff, and a jury's punitive damages award will not be disturbed, unless the verdict is so clearly excessive as to indicate passion and prejudice. *Id.* at 626–27.

¶ 57. First, we analyze the degree of grievousness or reprehensibility involved. As we declared in *Jacque,* "[t]he most important indicium of the reasonableness of a punitive damage award is the degree of reprehensibility of the defendant's conduct." *Jacque,* 209 Wis. 2d at 628; *see also BMW* 517 U.S. at 576 n.23 (citing David G. Owen, *A Punitive Damages Overview: Functions, Problems and Reform,* 39 Vill. L. Rev. 363, 387 (1994)) ("The flagrancy of the misconduct is thought to be the primary consideration in determining the amount of punitive damages.") *Id.* The grievousness or reprehensibility of Tower's conduct is clear from the record. Tower engaged in prohibited conduct while knowing or recklessly disregarding the lack of a reasonable basis for denying the claim. This court told Tower more than 30 years ago about the duty of an insurer to reform an insurance policy upon a discovery of mutual mistake. *See Trible v. Tower Ins. Co.,* 43 Wis. 2d 172, 168 N.W.2d 148 (1969). Not only was Tower told what to do in such

a situation of mutual mistake, but Tower was reminded of this decision by Jim Reynolds in his letter.

¶ 58.   Recently, the United States Supreme Court reiterated the rules for punitive damages with regard to repeat offenders, or "recidivist[s]". *Campbell*, 538 U.S. at ___. The United States Supreme Court said:

> Although "[o]ur holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance," *Gore, supra*, at 577, in the context of civil actions courts must ensure the conduct in question replicates the prior transgressions. *TXO*, 509 U.S. at 462 n. 28 (noting that courts should look to " 'the existence and frequency of similar past conduct' ") (quoting *Haslip*, 499 U.S. at 21–2).

*Id.*

¶ 59.   Tower disregarded the law and its duty to an insured like Trinity not once—but twice. Such repeated disregard for the law and its duty indeed seems egregious and reprehensible. *See BMW*, 517 U.S. at 576–77; *Jacque*, 209 Wis. 2d at 628. In viewing the evidence according to the rules set forth in *Jacque* and *Campbell*, the bad faith in this case involved Tower's intentional disregard of its duty to investigate diligently to ascertain and evaluate the facts and circumstances underlying the issuance of the policy and the accident, in order to arrive at a good faith decision. *See Prosser*, 225 Wis. 2d at 138.

¶ 60.   As stated previously, Gallagher, as the representative of Tower, made a series of decisions that illustrate bad faith on behalf of Tower. These acts of bad faith also buttress a determination of the egregiousness of Tower's conduct. The record indicates that Tower, through its prior involvement as the defendant in the *Trible* case, should have understood its obligation to

provide coverage to Trinity where clearly a mutual mistake had occurred. As noted in *Campbell,* recidivists, or repeat offenders, may be punished more severely, in that their conduct is viewed to be more "reprehensible than an individual instance of malfeasance." *Campbell,* 538 U.S. at ___.

¶ 61. Trinity lacked coverage due to a mutual mistake attributable to Tower's agent, Rodrian. The court of appeals recognized this. *See Trinity,* 251 Wis. 2d 212. Furthermore, it is undisputed, and recognized by the court of appeals and the circuit court, that Tower, through Gallagher, knew of this mutual mistake when it denied coverage to Trinity. *See id.,* ¶ 9 (citing to letter to Blackwell). There is no dispute that Trinity requested backdated coverage. *See id.*

¶ 62. In addition to the undisputed material facts, it is important to note that the record indicates that Gallagher, on behalf of Tower, made the decision to deny coverage without investigating Rodrian's requests for backdating, and without seeking available in-house legal counsel. Not only did Gallagher, on behalf of Tower, fail to investigate the situation properly, but the record reveals that Gallagher failed to contact Fischer, Tower's own underwriter, with whom Rodrian worked on the Trinity policy, about whether he understood Trinity to have requested hired and non-owned coverage. Furthermore, Tower decided to ask for summary judgment without informing the court of the dispute regarding Rodrian's error, and the request for backdating. These decisions, acts, and omissions on the part of Gallagher, on behalf of Tower, illustrate a continuing, egregious, and flagrant pattern of disregard toward Tower's duty owed to its insured, Trinity. As a result, we conclude that the egregiousness and reprehensibility factor has been met under the *BMW* test.

¶ 63. Next, we measure the disparity between the harm or potential harm suffered by Trinity and the punitive damages award. *Jacque,* 209 Wis. 2d at 628–29. When compensatory damages are awarded, the reviewing court is to consider whether the award bears a reasonable relationship to the award of compensatory damages, and to possible civil or criminal penalties. *Id.* at 629. Compensatory damages represent the actual harm inflicted on the plaintiff. *Id.* Wisconsin law expressly rejects the use of a fixed multiplier, either a fixed ratio of compensatory to punitive damages or of civil or criminal penalties to punitive damages, to calculate the amount of reasonable punitive damages. *Management Computer Servs.,* 206 Wis. 2d at 194. *Accord Cooper,* 532 U.S. at 434, and *BMW,* 517 U.S. at 582. However, we have held that in the appropriate case, a comparison of the compensatory damages and the punitive damages award is important. *Jacque,* 209 Wis. 2d at 629.[7]

¶ 64. With regard to the second guidepost, the disparity of harm or potential harm and the punitive damages award, the United States Supreme Court recently held:

> Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." *Ibid.,* see also *ibid.* (positing that a higher ratio *might* be necessary where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine"). The

---

[7] At trial, the attorney for Trinity claimed that Tower's alleged bad faith actions exposed Trinity to $490,000 in potential harm.

converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

*Campbell,* 538 U.S. at ___.

¶ 65. The facts and circumstances of Tower's conduct and Trinity's harm are clear. At trial, both parties were given the opportunity to introduce evidence and argue on this issue. Tower introduced evidence that the only potential damage in this case was $17,000; Trinity introduced evidence of a harm of $490,000 had Tower succeeded on its motion for summary judgment. The punitive damages award represents a 7:1 ratio of punitive damages to compensatory damages, if Trinity's position is applied.

¶ 66. Finally, under the *BMW* test, we engage in a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. *Jacque,* 209 Wis. 2d at 630. As noted by the United States Supreme Court:

The third guidepost in Gore is the disparity between the punitive damages award and the "civil penalties authorized or imposed in comparable cases." We note that, in the past, we have also looked to criminal penalties that could be imposed. The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility.

*Campbell,* 538 U.S. at ___.

¶ 67. The court of appeals found this factor "largely irrelevant" to the case at hand. *See id.* In reaching that conclusion, the court of appeals said that:

> [t]he legislature has not put into place a criminal or civil statute prohibiting insurance carriers from intentionally disregarding the contractual rights of an insured and rejecting claims on the basis of their own economic self-interest. Thus, as our supreme court held in *Jacque,* when a legislature has not prescribed penalties for the type of conduct engaged in by the defendant, this third guidepost becomes immaterial.

*Trinity Evangelical Lutheran Church v. Tower Ins. Co.,* 2002 WI App 46, ¶ 41, 251 Wis. 2d 212, 641 N.W.2d 504.

¶ 68. However, the legislature has provided a criminal penalty, including a fine of up to $10,000, for any violation of "any insurance statute or rule of this state." Wis. Stat. § 601.64(4). The Wisconsin Administrative Code contains insurance rules that prohibit unfair settlement practices, including the "[f]ailure to attempt in good faith to effectuate fair and equitable settlement of claims submitted in which liability has become reasonably clear." Wis. Admin. Code § Ins. 6.11 (3)(a)(4) (Jan., 2002). In this case, as noted previously, a 7:1 ratio results if Trinity's position on compensatory damages is accepted. Furthermore, as noted above, a criminal penalty has "less utility" when used to determine the dollar amount of the punitive damages award. *Campbell,* 538 U.S. at ___.

¶ 69. The factors discussed are the ones most relevant in this case. As noted previously, there are other factors that may be relevant given the nature of the case at hand. *See Management Computer Servs.,* 206 Wis. 2d at 194. Defendant's wealth is oftentimes a significant factor. In this case, the evidence presented to

the jury through the testimony of Trinity's expert, Robert Niendorf, appears sufficient to justify the size of the punitive damages award.[8]

## V. CONCLUSION

¶ 70. In summary, we conclude that the circuit court properly granted summary judgment on the issue of Tower's bad faith. No other reasonable inference can be drawn from the facts presented. Therefore, we reverse the court of appeals' decision in part. We also hold that the appropriate standard to be applied in reviewing a punitive damages award is a de novo review

---

[8] Over Tower's objections and motion to bar Niendorf's testimony, the circuit court admitted Niendorf's conclusion that Tower is able to pay a punitive damages award in one of three ways: by liquidating its assets (at the end of 1999, the Company had a net worth of $24,600,000); by drawing on insurance reserves, or "retained earnings," for a sum of approximately $15,000,000; or by restructuring its debt-equity ratio, allegedly yielding $18,700,000. Tower objected to the above evidence claiming that Niendorf's analysis improperly aggregated the financial position of Tower and its parent company, Atlas Assurance Company of America (Atlas). The circuit court redacted portions of Niendorf's testimony, but allowed Niendorf to testify to his conclusions.

The court of appeals at paragraphs 31–32 in its opinion said:

> [F]or our purposes . . . contrary to Tower's assertion, Niendorf's testimony did not include improper information about Tower's parent company. . . . It does not appear that Niendorf's theories regarding Tower's ability to pay relied on the financial well-being of Atlas. And finally, each source of money listed as available to satisfy a punitive damages judgment was totally internal to the financial assets of Tower. We hold that the process was untainted by Niendorf's testimony.

*Trinity*, 251 Wis. 2d 212, ¶ 31–32.

standard. Applying that standard, and the factors most relevant in this case, we affirm the court of appeals decision upholding the award of punitive damages by the jury.

*By the Court.*—The decision of the court of appeals is reversed in part and affirmed in part.

¶ 71.  DAVID T. PROSSER, J. *(dissenting).*  Justice Sykes has written a compelling dissent. It ably expresses several of my concerns, and I join it without reservation. I write separately because, for me, this case raises disconcerting questions about the future of trial by jury in civil cases.

¶ 72.  The Wisconsin Constitution provides that: "The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law." Wis. Const. art. I, § 5.

¶ 73.  We have said repeatedly that the right to trial by jury preserved by the constitution is the right as it existed at the time of the adoption of the constitution in 1848. *Town of Burke v. City of Madison,* 17 Wis. 2d 623, 635, 117 N.W.2d 580 (1962); *see also State v. Hansford,* 219 Wis. 2d 226, 234–37, 580 N.W.2d 171 (1998).

¶ 74.  Summary judgment did not exist as part of Wisconsin law in 1848. There should thus be sensitivity to the impact of summary judgment on jury trials as summary judgment practice evolves.

¶ 75.  In the early part of the twentieth century there were numerous cases testing the compatibility of summary judgment with the right of trial by jury. *See* Frank T. Boesel, *Summary Judgment Procedure,* 6 Wis.

L. Rev. 5, 9–13 (1930).[1] Most of the early cases upheld summary judgment procedure against constitutional attacks. In *Dwan v. Massarene,* 192 N.Y.S. 577 (N.Y. App. Div. 1922), for example, a New York court stated:

> The constitution provides (art. 1, sec. 2): "The trial by jury in all cases in which it has been heretofore used shall remain inviolate forever." It secures the right to a jury trial of the issues of fact in those cases where it had been theretofore used. This did not deprive the court of the power to determine whether there was an issue of fact to be tried; but if the court determined there was such an issue, it must be tried by a jury. A false denial interposed for the purpose of delay did not create such an issue, any more than a false affirmative defense.

*Dwan,* 192 N.Y.S. at 581, *quoted in* Boesel, *supra* note 1, at 9.

¶ 76.  In reviewing these early cases, one is struck by the caution with which courts addressed the constitutional issue. Courts defended summary judgment on the narrow grounds that judges should have the power to strike out sham or frivolous pleas, *Eisele & King v. Raphael,* 101 A. 200, 201 (N.J. 1917); *Towne v. Dunn,* 136 N.W. 562, 563 (Minn. 1912), and avoid unnecessary delay. Summary judgment was less encompassing then than it is today; even so, judicial opinions usually voiced

---

[1] Boesel begins his discussion with the following sentence:

> In New York the question of the constitutionality of this rule arose almost immediately after its adoption, and its validity was vigorously attacked. It was earnestly contended that by applying this rule the defendant was deprived of his constitutional right to a trial by jury, as provided for by the New York Constitution.

Frank T. Boesel, *Summary Judgment Procedure,* 6 Wis. L. Rev. 5, 9 (1930).

allegiance to the principle that *juries* should decide disputed facts and *juries* should pass on credibility.

¶ 77. In his law review article advocating that Wisconsin adopt a summary judgment rule or statute, Frank Boesel acknowledged that "the ascertainment and determination of what is and what is not a real bona fide defense presents the most difficult problem in [summary judgment's] application and administration." Boesel, *supra* note 1, at 17.

> Each case must, of course, be considered on its own particular facts and circumstances, and in disposing of each case presented to the court, little, if any, assistance will be derived from any attempts to apply general rules or principles. It would appear, however, that if there is any doubt whatever in the mind of the court as to the existence of such a bona fide issue, it should be resolved in favor of the defendant, and the matter determined only after a hearing or trial in the regular order. This is particularly true where a square question of credibility of witnesses arises . . . .

*Id.*

¶ 78. In Wisconsin there are many cases that describe summary judgment as "a drastic remedy." For example, in *Lecus v. Am. Mut. Ins. Co. of Boston,* 81 Wis. 2d 183, 260 N.W.2d 241 (1977), the court said: "We have often stated summary judgment is a drastic remedy and should not be granted unless the material facts are not in dispute, no competing inferences can arise, and the law that resolves the issue is clear. Summary judgment is not to be a trial on affidavits and depositions." *Id.* at 189.

¶ 79. As Justice Heffernan observed in *Village of Fontana-on-Geneva Lake v. Hoag,* 57 Wis. 2d 209, 203 N.W.2d 680 (1973), "summary judgment is a drastic remedy which, if granted, deprives the parties of a

367

trial." *Id.* at 214. His opinion went on to express concern about a litigant being "deprived of his constitutional right to try the issues of fact." *Id.*

¶ 80. The *Lecus* case stands for the additional proposition that the issue of intent is not one that properly can be decided on a motion for summary judgment, *Lecus,* 81 Wis. 2d at 190, and this principle is not dead. Similarly, the court of appeals has stated that "Summary judgment should not be granted where the resolution of a dispositive issue depends on state of mind." *Hudson Diesel v. Kenall,* 194 Wis. 2d 531, 547, 535 N.W.2d 65 (1995) (citing *Gouger v. Hardtke,* 167 Wis. 2d 504, 517, 482 N.W.2d 84 (1992)).

¶ 81. In the rush to move cases along, summary judgments can be abused. Summary judgments will not be constitutionally suspect so long as courts faithfully limit them to situations in which material facts are not in dispute, intent and state of mind are not at issue, and the credibility of witnesses is not material. As Justice Sykes clearly demonstrates, that is not the situation here.

¶ 82. This is a tort case involving an insurer's alleged breach of duty of good faith in dealing with its insured. *See* Wis JI—Civil 2761. The plaintiff was required to prove, among other things, that there was no reasonable basis for the insurance company to deny its claim. The case is more difficult than a traditional bad faith case because the policy issued by the insurance company did not contain hired and non-owned coverage, as the insured requested. Hence, Tower must have grappled with questions of whether it had to reform its policy and had to pay damages, or whether liability would be assumed or shared by the negligent insurance agent's errors and omissions insurance carrier.

¶ 83. Despite this situation, Circuit Judge Marianne Becker found every element of the *tort* of bad faith by the insurer to be beyond dispute. Our court of appeals disagreed, but this court overrules the court of appeals' determination that material facts were in dispute and insists that no inferences helpful to the insurer could have been drawn from the facts. This is breathtaking. Surely, we have come a long way from the days when this court said that on summary judgment a court does not try the issues but only decides whether there is an issue for trial. *Wis. Tel. v. Cent. Contracting,* 254 Wis. 480, 483, 37 N.W.2d 24 (1949).

¶ 84. What the majority decision seems to ignore is that the tort of bad faith is inextricably linked to the punitive damages issue that went to the jury. At trial, Tower Insurance was not able to defend itself on a level playing field. The circuit court left handprints on the scales of justice by taking the bad faith issue from the jury and *instructing* the jury as to the defendant's bad faith.

¶ 85. The plaintiff was a church, the defendant was an insurance company, and the judge was making official pronouncements about the defendant's bad faith. Is there any wonder that the jury awarded $3,500,000 in punitive damages?

¶ 86. This case may be precedent for generations to come. The procedure we ratify is wrong, even if the result can be defended.

¶ 87. DIANE S. SYKES, J. *(dissenting).* I respectfully dissent. I agree with the court of appeals that the circuit court's sua sponte order granting summary judgment to Trinity on its bad faith claim was improper. The tort of bad faith is an intentional tort. *Anderson v. Continental Ins. Co.,* 85 Wis. 2d 675, 691, 271 N.W.2d

368 (1978). "To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id.*

¶ 88. The tort of bad faith contains an objective and a subjective element. *Weiss v. United Fire & Cas. Co.,* 197 Wis. 2d 365, 377, 541 N.W.2d 753 (1995). The first element—the absence of a reasonable basis for denying the claim—is objective. *Id.* at 378. The second element—the defendant's knowledge or reckless disregard of the absence of a reasonable basis for denying the claim—is subjective. *Id.* at 392. The "subjective component can be inferred from a 'reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured.' " *Id.* (quoting *Anderson,* 85 Wis. 2d at 693).

¶ 89. Issues of subjective intent are generally not suitable for resolution on summary judgment. *Tri-Tech Corp. of America v. Americorp Serv., Inc.,* 2002 WI 88, ¶ 30 n.5, 254 Wis. 2d 418, 646 N.W.2d 822. "We have stated [that] the issue of . . . intent is not one that properly can be decided on a motion for summary judgment. Credibility of a person with respect to his subjective intent does not lend itself to be determined by affidavit." *Lecus v. American Mut. Ins. Co. of Boston,* 81 Wis. 2d 183, 190, 260 N.W.2d 241 (1977) (citing *Doern v. Crawford,* 30 Wis. 2d 206, 214, 140 N.W.2d 193 (1966)); *see also Green Spring Farms v. Spring Green Farms Assoc.,* 172 Wis. 2d 28, 41, 492 N.W.2d 392 (Ct. App. 1992).

¶ 90. Here, Tower moved for summary judgment on the bad faith claim, arguing that it had a reasonable basis to deny Trinity's coverage claim as a matter of law. Trinity opposed the motion, arguing that there was no

reasonable basis to deny the claim (because it was entitled to reformation of the policy) and that there were disputed issues of material fact regarding Tower's knowledge or reckless disregard, requiring a jury trial. The circuit court denied Tower's motion, but then, pursuant to Wis. Stat. § 802.08(6), sua sponte entered summary judgment for Trinity. The parties eventually stipulated to compensatory damages in the amount of $17,570, representing the reasonable value of the attorneys' fees Trinity had incurred in proving up insurance coverage. The case proceeded to trial on the issue of punitive damages only.

¶ 91. The court of appeals concluded that summary judgment was inappropriate because "the facts related to what Tower actually knew and thus whether there was intentional disregard are in dispute." *Trinity Evangelical Lutheran Church v. Tower Ins. Co.,* 2002 WI App 46, ¶ 21, 251 Wis. 2d 212, 234, 641 N.W.2d 504. The majority correctly notes that this misstates the intent component of the bad faith tort, which requires "knowledge or reckless disregard of the lack of a reasonable basis for denying the claim" rather than "intentional disregard" as stated by the court of appeals. *Anderson,* 85 Wis. 2d at 691; majority op., ¶ 37. However, later in its opinion, the court of appeals reframes the disputed issue as "whether the facts necessary to evaluate the claim were properly investigated and developed or recklessly ignored and disregarded," or alternatively, whether there was a "knowing failure to exercise an honest and informed judgment." *Id.,* ¶¶ 25, 27. This correctly states the subjective intent component of the bad faith tort.

¶ 92. Because issues of subjective intent are generally not amenable to resolution on summary judgment—particularly summary judgment entered

sua sponte—I agree with the court of appeals that summary judgment on the bad faith claim was improperly granted. The circuit court's written decision on summary judgment notes that "[Gene] Gallagher [Tower's vice president] testified that he did not actually know whether Trinity had requested non-owned and hired auto insurance." Decision on Motion for Summary Judgment, July 21, 1999, p. 7. Nevertheless, the circuit court concluded that Gallagher's failure to contact the underwriter Fischer (who testified that he had actual knowledge), consult with legal counsel, or contact Trinity satisfied the subjective knowledge element of bad faith under *Anderson*. Decision on Motion for Summary Judgment, p. 8.

¶ 93. While the evidence cited by the circuit court strongly supports a finding of reckless disregard, Tower was entitled to have a jury decide the matter after a trial rather than have the circuit court do so on the basis of a paper record. Evaluating issues of knowledge or recklessness involves weighing credibility and drawing inferences, a task for a jury at trial, not a court on summary judgment. Although it was not entitled to summary judgment in its favor on the objective element of the tort of bad faith (the absence of a reasonable basis to deny the claim), Tower was entitled to litigate at least the subjective element at a jury trial.

¶ 94. This is especially true in light of the claim for punitive damages, which was tried on the basis of instructions that informed the jury that the court had determined "as a matter of law" and as a result of "undisputed material facts" that Tower had "acted in bad faith in denying coverage to Trinity because, A, Tower lacked a reasonable basis for denying coverage to Trinity . . . and, B, based on Tower's failure to conduct an adequate investigation of Trinity's claim for cover-

age, Tower recklessly failed to ascertain that coverage to Trinity . . . should have been provided." As a result of the summary judgment, Tower was precluded from presenting evidence or argument that it was not guilty of bad faith—either the objective or the subjective components of the claim. Instead, the jury was told that Tower's bad faith was an established matter, not open to dispute, and that it need only decide whether Trinity was entitled to punitive damages.

¶ 95. Accordingly, I do not agree with the majority's decision to reverse the court of appeals and reinstate the circuit court's grant of summary judgment. I would affirm the court of appeals' decision to the extent that it reversed and remanded for trial on Trinity's bad faith claim.

¶ 96. Although the court of appeals reversed the circuit court's order of summary judgment on the bad faith claim, it nevertheless upheld the jury's $3.5 million award of punitive damages. The majority affirms this part of the court of appeals' opinion. I do not agree.

¶ 97. Any punitive damages claim is necessarily interwoven in the underlying determination of liability or fault. This is particularly true in the intentional tort of bad faith, for which liability attaches only upon a determination of the defendant's knowing or reckless disregard of the rights of the plaintiff. Here, the entry of summary judgment eliminated Tower's ability to present evidence that it did not possess the requisite level of intent to establish liability for the intentional tort upon which any award of punitive damages would necessarily be premised. The starting point for the jury was the fact that Tower's bad faith had already been conclusively established. The circuit court instructed the jury that bad faith and reckless disregard had been determined by the court as a matter of law on the basis

373

of "undisputed material facts," which necessarily influenced the jury's consideration of the appropriateness and amount of punitive damages. For this reason alone, I would reverse the award of punitive damages.

¶ 98.   In addition, however, the punitive damages award cannot withstand the due process test for excessiveness established in *BMW of North America v. Gore,* 517 U.S. 559, 575 (1996), which requires a reviewing court to evaluate, de novo, 1) the degree of reprehensibility of the conduct; 2) the disparity or ratio between the punitive damages award and the harm or potential harm suffered; and 3) the difference between the punitive damages award and any civil or criminal penalties authorized for the conduct.[1] *See also Cooper Industries v. Leatherman Tool Group,* 532 U.S. 424, 431 (2001).

¶ 99.   The United States Supreme Court has very recently reaffirmed the *BMW* test and the requirement of de novo review: "Exacting appellate review ensures that an award of punitive damages is based upon an 'application of law, rather than a decisionmaker's caprice.' " *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. ___, 123 S.Ct. 1513, 1520–21 (2003), (citing *Cooper Industries,* 532 U.S. at 436, quoting in turn *BMW,* 517 U.S. at 587 (Breyer, J., concurring)).

---

[1] While the majority applies a de novo standard of review (as it must under *Cooper Industries v. Leatherman Tool Group,* 532 U.S. 424 (2001)), it sows some potential for confusion by citing certain language from *Jacque v. Steenberg Homes, Inc.,* 209 Wis. 2d 605, 626, 563 N.W.2d 154 (1997): "[w]e are reluctant to set aside an award merely because it is large or we would have awarded less." Majority op., ¶ 46. De novo review requires independent evaluation by the reviewing court, which may indeed result in a substitution of the reviewing court's opinion for that of the jury, contrary to the quoted language in *Jacque.*

¶ 100. *Campbell,* like this case, was a bad faith cause of action against an insurance company. The issue was whether "an award of $145 million in punitive damages, where full compensatory damages are $1 million, is excessive and in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States." *Id.* at 1517. The Supreme Court invalidated the $145 million punitive damages award, concluding that it "was neither reasonable nor proportionate to the wrong committed," and that it was "an irrational and arbitrary deprivation of the property of the defendant." *Id.* at 1526.

¶ 101. Under both *BMW* and the Supreme Court's recent decision in *Campbell,* de novo review of the degree of reprehensibility of the defendant's conduct depends in part on whether the conduct was violent, caused physical injury, or was "purely economic," and whether it involved "trickery and deceit" or something closer to mere negligence. *BMW,* 517 U.S. at 575–76; *Campbell,* 123 S.Ct. at 1521. Exemplary or punitive damages "should reflect 'the enormity of [the] offense.'" *BMW* at 575. In *Campbell,* the Supreme Court elaborated:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. . . . The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*Campbell,* 123 S.Ct. at 1521.

¶ 102. None of these factors is present here. The conduct at issue implicated economic injury only (insurance coverage), and, in fact, Trinity was never at risk of having no insurance at all; either the agent's insurance carrier would provide coverage, or Tower would, depending upon the outcome of the coverage dispute. Also, Tower provided legal counsel and a defense as soon as Trinity was sued, and ultimately stipulated to reformation and paid the underlying claim. No one was physically injured; no one's health or safety was at risk. Nor was there any financial vulnerability, for the reasons just noted. There was no intentional malice, trickery, or deceit.

¶ 103. The majority characterizes Tower as a "recidivist" for purposes of evaluating the reprehensibility of its conduct, citing the fact that Tower was the defendant in *Trible v. Tower Ins. Co.,* 43 Wis. 2d 172, 168 N.W.2d 148 (1969). Majority op., ¶¶ 59–60. By no stretch of the facts or imagination can Tower be considered a "recidivist" on the basis of *Trible.*

¶ 104. In *Trible,* this court held that an insurance agency's mistake is attributable to the insurer under agency law, and that reformation is an appropriate remedy for mutual mistake in an application for insurance. *Trible,* 43 Wis. 2d at 181–84. Yes, Tower was the defendant in *Trible,* but it was *not* a bad faith case; it was an action on an insurance contract, and in affirming the circuit court's reformation of the policy we noted that there had been a factual dispute on the issue of mistake, which had been resolved by the factfinder in favor of the insured. *Trible,* 43 Wis. 2d at 180. Contrary to the majority's assertions, then, majority op., ¶ 59, *Trible* did not hold that Tower had violated any duty, disregarded any law, or otherwise committed bad faith

against its insured. Tower can hardly be considered a "repeat offender" on the basis of *Trible*.

¶ 105. "[P]erhaps [the] most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *BMW,* 517 U.S. at 580. Punitive damages "must bear a 'reasonable relationship' to compensatory damages." *Id.* Here, $3.5 million in punitive damages was awarded on the basis of only $17,570 in compensatory damages, a very steep 200:1 ratio.

¶ 106. Without even mentioning this 200:1 ratio of punitive damages to actual compensatory damages in this case, the majority, like the court of appeals, seems to adopt (although this is not entirely clear) Trinity's position that there is only a 7:1 ratio between the punitive and compensatory damages, citing evidence of "a harm" of $490,000. Majority op., ¶ 65. The $490,000 figure represents Trinity's liability in the underlying auto accident, but that amount has no bearing on the actual or even potential compensatory damages in the bad faith claim. As noted above, Trinity was never at risk for the auto accident damages, because either the agent (that is, his errors and omissions carrier) or Tower was responsible for the mistake in the insurance application. The actual compensatory damages in the bad faith claim consisted of the attorneys' fees Trinity incurred in the coverage dispute, not the personal injury damages in the underlying lawsuit, which Trinity would not and did not have to pay.[2]

---

[2] In discussing the standard of review, the majority notes that in *Management Computer Services v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 557 N.W.2d 67 (1996), this court faulted the circuit court for setting forth only "conclusory reasons" and failing to "analyze the evidence" on a punitive damages issue. Majority op., ¶ 48. The majority makes the same mistake here

¶ 107. The majority recognizes that due process requires a comparison of punitive damages to compensatory damages, and that "[c]ompensatory damages represent the actual harm inflicted on the plaintiff." Majority op., ¶ 63. Inexplicably, the majority fails to undertake the proper comparison (punitive damages to actual compensatory damages) and instead endorses (apparently) an improper comparison of punitive damages to a measure of "potential harm" that has no relationship to the bad faith claim upon which the punitive damages award was premised. As noted above, there was no "potential" that Trinity would have to pay the claimant in the underlying lawsuit, because either the insurance agent or Tower would be required to do so depending upon the result of the coverage litigation. In any event, a comparison of punitive damages to a creative (but obviously inapplicable) measure of "potential harm" is entirely inappropriate where, as here, actual compensatory damages have in fact been determined. Indeed, the jury was instructed that the compensatory damages were $17,570 and that punitive damages may be awarded based upon that amount of compensatory damages. The majority's position, appar-

in its evaluation of the second *BMW* factor. It says that "Tower introduced evidence that the only potential damage in this case was $17,000." Majority op., ¶ 65. Actually, the $17,570 figure definitively represents the actual—not "potential"— compensatory damages in this case. The majority then notes that "Trinity introduced evidence of a [potential] harm of $490,000," and goes on to conclude that "[t]he punitive damages award represents a 7:1 ratio of punitive damages to compensatory damages, *if* Trinity's position is applied." *Id.* (emphasis added). Apparently the majority is adopting "Trinity's position," although it does not say so directly (there is the qualifier "if"), and it gives no reasons for doing so.

ently adopting Trinity's, amounts to nothing more than a manipulation of the ratio for purposes of due process scrutiny.[3]

¶ 108. The majority's approach to this second *BMW* factor is also directly at odds with *Campbell.* There, the Supreme Court compared the punitive damages award to the actual compensatory damages in the bad faith action, not the damages in the underlying auto accident litigation. *Campbell,* 123 S.Ct. at 1524.

¶ 109. The Supreme Court also stated in *Campbell* that it is now an established principle in the law of punitive damages that "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *Id.* at 1524. The Court, having declared that the case was "neither close nor difficult," held that the 145:1 ratio of punitive-to-compensatory damages in *Campbell* could not pass constitutional muster. *Id.* at 1522, 1526. Particularly in light of this most recent pronouncement from the Supreme Court, the 200:1 punitive-to-compensatory damages ratio in this case clearly exceeds constitutional limits.

---

[3] The Supreme Court reiterated in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. ___, 123 S.Ct. 1513, 1520 (2003), that "[t]he Due Process Clause does not permit a State to classify arbitrariness as a virtue. Indeed, the point of due process—of the law in general—is to allow citizens to order their behavior. A State can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim." The Court also stated that "[t]he principles set forth in *Gore* must be implemented with care, to ensure both reasonableness and proportionality." *Id.* at 1525–26. The majority's summary and vague apparent adoption of Trinity's position lacks the clarity of analysis required by the de novo due process review the Supreme Court has mandated.

¶ 110. The third factor of the *BMW* analysis requires a comparison of the punitive damages award to any "civil or criminal penalties that could be imposed for comparable misconduct." *BMW,* 517 U.S. at 583. The majority notes that the court of appeals dismissed this factor as "largely irrelevant" because the court had concluded that the "legislature has not prescribed penalties for the type of conduct engaged in by the defendant." Majority op., ¶ 67 (quoting *Trinity,* 2002 WI App 46, ¶ 41).

¶ 111. The majority goes on to note that the legislature has in fact provided a criminal penalty, including a fine of up to $10,000, for any violation of "any insurance statute or rule of this state," Wis. Stat. § 601.64(4), and that the Wisconsin Administrative Code contains insurance rules that prohibit unfair settlement practices, including the "[f]ailure to attempt in good faith to effectuate fair and equitable settlement of claims submitted in which liability has become reasonably clear." Wis. Admin. Code § Ins. 6.11(3)(a)(4) (Jan. 2002). Majority op., ¶ 68. This statute and rule proscribe conduct that is comparable to the tort of bad faith. The $3.5 million punitive damages award in this case, evaluated against the $10,000 maximum fine provided for in Wis. Stat. § 601.64(4), yields a 350:1 ratio, even more startling than the 200:1 ratio for punitive-to-compensatory damages. In *Campbell,* the Supreme Court said it "need not dwell long on this [*BMW*] guidepost" because the applicable $10,000 state fine for comparable conduct was "dwarfed by the $145 million punitive damages award." *Campbell,* 123 S.Ct. at 1526. The same is true here.[4]

---

[4] The majority cites certain language from *Campbell* regarding the third *BMW* factor, but it does so incompletely.

¶ 112. Our own precedent also requires that this punitive damages award be reversed. In *Management Computer Services v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 196, 557 N.W.2d 67 (1996), this court held that a punitive damages award of $1.75 million on a compensatory damages award of $65,000 "is shocking to the conscience of the court." Applying the *BMW* test, particularly the requirements that punitive damages bear a reasonable relationship to compensatory damages and possible criminal penalties for comparable misconduct (there, as here, $10,000), and noting that the case (like this one) involved economic injury only, this court concluded that the $1.75 million punitive damages award "is excessive and therefore a violation of due process, because it is more than is necessary to serve the purposes of punitive damages." *Management Computer Servs.*, 206 Wis. 2d at 196.

¶ 113. It is true that there is no "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable" for purposes of comparing punitive damages to compensatory damages or comparable civil or criminal penalties. *BMW*, 517 U.S.

Majority op., ¶ 66. After indicating in *Campbell* that a criminal penalty may have "less utility" when used to determine the amount of punitive damages, the Supreme Court went on to emphasize that "[g]reat care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." *Campbell*, 123 S.Ct. at 1526. As this additional language from the decision makes clear, the Court in *Campbell* was cautioning against using the existence of an applicable criminal penalty as grounds to *sustain* a punitive damages award, not the converse.

at 583. *Management Computer Services'* 30:1 ratio of punitive to compensatory damages and 175:1 ratio of punitive damages to comparable criminal penalties was "shocking to the conscience of the court" and excessive to the point of violating due process. *Management Computer Servs.*, 206 Wis. 2d at 196. I can find no principled way to reach a different conclusion in this case, which presents a 200:1 ratio of punitive to compensatory damages and a 350:1 ratio of punitive damages to comparable criminal penalties.

¶ 114.   Accordingly, I would reverse the court of appeals' decision to the extent that it upheld the award of punitive damages in this case, and remand the entire matter for a new trial on bad faith liability as well as punitive damages.

¶ 115.   I am authorized to state that Justices JON P. WILCOX and DAVID T. PROSSER JR. join this dissent.