SHIRLEY S. ABRAHAMSON, C.J.
¶ 74. {dissenting). The majority opinion reaches a shocking result: It makes First American's wrongdoing an efficient way of doing business. For all its reprehensible conduct, First American in fact pays less by acting in bad faith and wrongfully refusing to pay the Kimbles' claim than it would have paid had it honored the claim in good faith after discovering its error. Under the majority opinion, the combined punitive and compensatory damages amount to $239,738.49 — a sum smaller *411 than the title insurance policy limit of $370,000. This result directly contravenes the entire purpose of punitive damages — making wrongdoers pay and deterring future wrongful conduct.
¶ 75. Trinity Evangelical Lutheran Church & School-Freistadt v. Tower Insurance Co., 2003 WI 46, 261 Wis. 2d 333, 661 N.W.2d 789, is the leading case for determining whether punitive damages are unconstitutionally excessive as a violation of due process. The majority opinion dutifully recites the Trinity factors.[1] Yet the majority opinion jettisons Trinity, turning the test on its head in favor of the reasoning set forth in Trinity's dissent.
¶ 76. The majority opinion achieves a result in which the wrongdoer was enriched by its wrongdoing. This result, in my opinion, cannot stand.
¶ 77. The test in Trinity applies six factors to assess whether a punitive damages amount is justified:
1. The grievousness of the acts;
2. The degree of malicious intent;
3. Whether the award bears a reasonable relationship to the award of compensatory damages;
4. The potential damage that might have been caused by the acts;
5. The ratio of the award to civil or criminal penalties that could be imposed for comparable conduct; and
6. The wealth of the wrongdoer.
Majority op., ¶ 48; Trinity, 261 Wis. 2d 333, ¶ 53.
¶ 78. It is perverse not to apply the Trinity test to the instant case. The instant case is on all fours with Trinity. In both cases an insurance company refused to *412 pay the insured's claim (breach of contract); the court found that the insurance company breached the insurance contract; the insurance company was found to have acted in bad faith; and the fact-finder found that the misconduct justified a punitive damage award.[2]
¶ 79. In Trinity, the court held that due process was satisfied by a punitive damages amount of $3,500,000 based on a potential harm of $490,000, a 7:1 ratio.
*413 ¶ 80. Because the majority opinion fails to apply Trinity properly, I dissent.
I
¶ 81. The first factor of the Trinity test is the grievousness of the acts. The insurance company's misconduct was substantially the same in Trinity and in the present case:
• In each case, an insurance company was sued by its insured (or someone standing in the insured's shoes);
• In each case, the insurance company had failed to pay the claim of its own insured;
• In each case, the insurance company was given repeated opportunities to pay the claim and refused to do so, despite knowing the facts justifying payment of the claim;
• In each case, the insurance company was found to have acted in bad faith; and
• In each case, a jury awarded over $1 million in punitive damages.
¶ 82. The Trinity court held that the insurance company's misconduct constituted a "continuing, egregious, and flagrant pattern of disregard toward [the insurance company's] duty owed to its insured," which justified the punitive damages in that case.[3]
¶ 83. The majority opinion in the present case characterizes First American's conduct as not as reprehensible as that of the insurance company in Trinity. Majority op., ¶¶ 53-55, 71.
*414 ¶ 84. The majority opinion's conclusion does not square with the facts of the two cases.
¶ 85. First, as in Trinity, the legislature has made the insurance company's misconduct a crime, demonstrating the public policy of this state regarding the misconduct's reprehensibility. See majority op., ¶ 69; accord Trinity, 261 Wis. 2d 333, ¶ 57.
¶ 86. Second, as in Trinity, First American's misconduct was repeated; First American was a recidivist.[4] In Trinity, the court noted that the insurance company's agent "made a series of decisions that illustrate bad faith" and chastised the insurance company's repeated misconduct and failure to investigate.[5]
¶ 87. The majority opinion erroneously states that First American's misconduct was "an isolated incident," and that "there is no indication from the record that First American engaged in repeated conduct." Majority op., ¶ 51. On the contrary, First American in the instant case demonstrates a pattern of repeated misconduct. After discovering its initial error, First American had many opportunities to remedy its misconduct and instead continued to act improperly:
• When the Kimbles first inquired about their road access, First American asserted that an easement gave them access, when it in fact knew that the easement granted to the Kimbles was invalid.[6]
*415 • When the Kimbles inquired whether they could assert a claim to the easement, First American assured them that they had road access.[7]
• At trial, First American's agent admitted that it discovered the deed that rendered the Kimbles' easement invalid, and chose never to inform the Kimbles about the deed.[8]
• At trial, First American's agent admitted that it deliberately failed to investigate the alleged title defect.[9]
• Each time the Kimbles inquired as to their access, First American insisted that the Kimbles could access the road, variously stating that the Kimbles could go across a 25-foot strip to which they had no *416 access,[10] through a wetland that was barred from road construction,[11] and confusingly, "by water."[12]
¶ 88. The majority opinion maintains that the repeated misconduct here is less reprehensible than the repeated misconduct in Trinity because the insurance *417 company in Trinity had committed similar misconduct in another case 30 years previously. Majority op., ¶ 53.
¶ 89. Yet the key factor for the reprehensibility of the insurance company's misconduct in Trinity was not that a 30-year-old prior court case existed or that the insurance company knew about it, but rather that the insurance company's "decisions, acts, and omissions . . . illustrate a continuing, egregious, and flagrant pattern of disregard toward [the insurance company's] duty owed to its insured .. .." Trinity, 261 Wis. 2d 333, ¶ 62.
¶ 90. The record in the present case demonstrates that First American exhibited a similar continuing, egregious, and flagrant pattern of misconduct.
II
¶ 91. The second factor is whether there was "intentional malice."
¶ 92. The majority opinion in the present case states that "there is no indication of intentional malice on the part of the First American or its employees." Majority op., ¶ 52. Similarly, the Trinity court concluded that there was no indication of intentional malice in that case either. Indeed Trinity does not require malice in order for punitive damages to be awarded. Rather, Trinity justified the amount of the punitive damages award on the insurance company's "intentional disregard of its duty to investigate diligently to ascertain and evaluate the facts and circumstances . . .." Trinity, 261 Wis. 2d 333, ¶ 59.
¶ 93. The jury in the instant case found sufficient grounds to justify a finding that punitive damages should be awarded, based on the evidence presented and the jury instructions. The jury instructions stated that the jury should award punitive damages if it found *418 that "the defendant acted maliciously toward the plaintiff or in an intentional disregard for the rights of the plaintiff."[13] With a $1 million jury award of punitive *419 damages, the jury found the "high degree of culpability" that could justify a punitive damages award.[14] Credible evidence supports the jury's finding of either malicious intent or intentional disregard of the rights of the insured. The majority opinion does not state that the evidence was insufficient for the jury to make such a finding. The jury finding is sufficient to satisfy Trinity.
Ill
¶ 94. The Trinity test's third factor (ratio of compensatory damages to punitive damages) and fourth factor (potential damage to the plaintiff) are linked.
¶ 95. Trinity examined the ratio between potential harm and punitive damages to determine the appropriateness of the award. Trinity, 261 Wis. 2d 333, ¶ 65. "Wisconsin law expressly rejects the use of a fixed multiplier . . . ." Trinity, 261 Wis. 2d 333, ¶ 63.
¶ 96. Despite the lack of a fixed multiplier, Trinity provides a benchmark for the court. If a 7:1 ratio of punitive damages to potential harm ($3,500,000 punitive; $450,000 potential harm) and a 200:1 ratio of punitive damages to actual damages ($3,500,000 punitive; $17,570 actual damages) were permissible in Trinity, the instant case, so similar in facts, also supports an identical or similar ratio.
¶ 97. The amount of potential harm is calculated by analyzing " 'the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.'" TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 460, (1993) (quoted source omitted).
¶ 98. In the instant case, the Kimbles were harmed. They had an offer to buy their property for *420 $1.3 million. They wanted to sell. They chose to reduce the asking price to secure the sale because they needed to care for aging parents who had lost their home. The Kimbles introduced evidence that the sale failed because of the lack of road access, a defect in marketable title that had been insured by First American.
¶ 99. The Kimbles had purchased title insurance to protect them from damages arising out of the unmarketability of their title. The policy limit was $370,000. The value of the property with marketable title was about three times the policy limit.
¶ 100. The majority opinion erroneously asserts that a consideration of the loss of value of Kimbles' home would force the court "to depart from the facts of the record and speculate that, had the Kimbles failed to discover First American's bad faith, they would have been completely unable to sell their property, rendering it valueless." Majority op., ¶ 62.
¶ 101. Yet this potential harm is borne by the record. The lack of access constituted "unmarketability of the title."[15] The policy itself defines "unmarketability of the title" as "an alleged or apparent matter affecting the title to the land . . . which would entitle a purchaser of the estate [or the Kimbles] to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title." As First American's agent stated in a deposition entered into *421 evidence at trial, the risk of wrongly denying the claim was that the Kimbles "would have had a real big claim on the policy . . .
¶ 102. In Trinity, the facts were similar. The insured in Trinity would have incurred a potential loss of up to $490,000 (damages in the auto accident case), had the insurance company successfully continued to deny Trinity Church's claim. The majority opinion in Trinity used the $490,000 figure for evaluating the punitive damages award.
¶ 103. In the instant case, the Kimbles would have potentially incurred a loss of up to $1.3 million, the sale price of the property if they had marketable title, and would not have recovered First American's title policy limits ($370,000), had First American successfully denied the Kimbles' claim.
¶ 104. The majority opinion refuses to use the $1.3 million sale price or $370,000 policy limit figures to calculate punitive damages. Instead the majority opinion adopts the reasoning of the dissent in Trinity.
¶ 105. Justice Sykes' dissent in Trinity argues that the insured "was never at risk for the auto accident damages, because either the agent (that is, his error and omissions carrier) or [the insurance company] was responsible for the mistake in the insurance application. The actual compensatory damages in the bad faith claim consisted of the attorneys' fees Trinity [Church] incurred in the coverage dispute, not the personal injury damages in the underlying lawsuit, which Trinity [Church] would not and did not have to pay." Trinity, 261 Wis. 2d 333, ¶ 106.
¶ 106. The majority opinion in the present case follows Justice Sykes' approach by severely limiting what is actual and potential harm, rather than employ *422 ing the correct Trinity majority opinion approach of using "the harm that is likely to result."[16]
¶ 107. When title is not marketable, the significantly reduced value of the property and the inability of an insured to collect from the title insurance company are exactly "the harm[s] that [are] likely to have occurred" when a title insurance company fails to pay a worthy claim. Thus, the proper potential harm is at least the policy limits of $370,000, if not the lost sale of the house ($1.3 million), or both, rather than the mere $40,000 used by the majority opinion.
¶ 108. As to the proper ratio here, the majority opinion relies upon its mistaken "reprehensibility of conduct" analysis to justify a lower ratio than the Trinity 7:1 ratio of punitive damages to potential harm and the 200:1 ratio of punitive damages to actual damages that this court held constitutional. Trinity, 261 Wis. 2d 333, ¶¶ 65, 68, 105; majority op., ¶ 66.
¶ 109. Even though the misconduct of First American here is essentially analogous to the misconduct in Trinity and may even be more egregious, the majority opinion applies only one guiding principle: High numbers for compensatory and punitive damages are bad; low numbers are good.
¶ 110. The majority settles on its 3:1 ratio for no ostensible reason other than that it is lower than the 7:1 and 200:1 ratios in Trinity and the 4:1 ratio in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 23-24 (1996). Yet in Pacific Mutual Life Insurance Co., the United States Supreme Court held that the 4:1 ratio was "close to the line," not over it.
*423 ¶ 111. The majority opinion also looks to a newly adopted state statute, which fixes $200,000 or a 2:1 ratio of punitive damages to compensatory damages as the limits for punitive damages awards. Majority op., ¶ 66 n.23. The statute is irrelevant. The majority opinion deliberately defies the legislative direction that the statute does not apply to the present case. Furthermore, the constitutional due process doctrine that we must apply in the present case rejects a fixed amount for punitive damages or a fixed multiplier. "Excessive" for due process purposes is a "fluid concept" that takes "substantive content from the particular context[] in which the standard!] [is] being assessed."[17]
¶ 112. What was good enough for the Trinity court seems to no longer be good enough for the majority opinion in the present case.
IV
¶ 113. The fifth Trinity factor is "a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." Trinity, 261 Wis. 2d 333, ¶ 66. I agree with the majority opinion that the imposition of criminal or civil fines does not directly impact the amount of punitive damages in the instant case, for the same reasoning we used in Trinity. See majority op., ¶ 69.
¶ 114. Nevertheless, the prohibited conduct's punishment by criminal sanctions under Wis. Stat. § 601.64(4) evinces the legislative determination of the reprehensibility of First American's misconduct.
*424 V
¶ 115. The sixth Trinity factor is the wealth of the wrongdoer. The United States Supreme Court has also recognized the wealth of the wrongdoer as a factor to be considered in gauging the constitutionality of a punitive damage award.[18]
¶ 116. The purpose behind the wealth factor is to punish wrongdoers and make the penalty for wrongdoing sufficiently high for wealthy wrongdoers that they are deterred from engaging in future misconduct.[19]
¶ 117. In the instant case, the record demonstrates that in 2010, First American had revenues over *425 $2 billion and net profits of $65 million. First American easily had the ability to pay the $1 million the jury awarded as punitive damages and then some.
¶ 118. Yet in the instant case, the majority opinion's result, as I noted previously, creates a final combined punitive and compensatory damages amount of $239,738.49 — a sum smaller than the title insurance policy limit of $370,000. The majority opinion makes First American's wrongdoing an efficient course of business. First American in fact pays less by acting in bad faith and wrongfully refusing to pay the Kimbles' claim than it would have paid had it honored the claim in good faith after discovering its error. This result directly contravenes the entire purpose of punitive damages, let alone the purpose of awarding punitive damages against a wealthy defendant.[20]
¶ 119. The majority opinion again strays from Trinity. Trinity held, contrary to the majority opinion in the instant case, that evidence of the insurance company's wealth and ability to pay the full amount was "sufficient to justify the size of the punitive damages award." Trinity, ¶ 69. In Trinity, the company would have had to liquidate assets to pay the award.[21] First American has no similar concern here.
*426 ¶ 120. The majority opinion dismisses the wealth factor in the present case in a footnote, flouting Trinity and the United States Supreme Court cases. The majority opinion states simply that "it is not significant in this case." Majority op., ¶ 70 n.25. Why is the wealth of First American not significant in this case? The majority opinion does not explain, other than to cryptically state that "[t]he record indicates that First American would likely be able to pay the amount specified by the jury." Id. Is the majority opinion implying that First American's ability to pay means the punitive damages were too low or that the punitive damages can never be high enough to deter First American's misconduct in the future? Is First American too big, too well-to-do to punish?
ij< ^
¶ 121. The majority opinion has ignored and misapplied the Trinity test to substantially similar facts in the present case and reaches an outcome contrary to Trinity.
¶ 122. The majority opinion achieves a result in which the wrongdoer is enriched by its wrongdoing. First American ends up paying less in damages for acting improperly than it would have paid had it acted properly and paid the claim. This result, in my opinion, cannot stand.
¶ 123. For the foregoing reasons, I dissent.
¶ 124. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

 Here are the facts of Trinity: An employee of Trinity Church, the insured, was in a motor vehicle accident, and Trinity Church was liable for damages of $490,000.
An agent of Tower Insurance erred by not providing Trinity Church the coverage that Trinity Church requested.
Tower Insurance refused to reform the policy to cover Trinity Church (as the law required it to do) and to pay $490,000 on behalf of Trinity Church. Trinity Church sued Tower Insurance for breach of contract, bad faith, and punitive damages.
Tower Insurance paid $490,000 on Trinity Church's behalf.
The Trinity court used the $490,000 figure as harm to Trinity Church to calculate the punitive damages. Had Tower Insurance's misconduct not been discovered, Trinity Church would have had to pay the full $490,000 from its own funds; Tower Insurance would have received a net gain of $490,000. In calculating the harm to Trinity Church, the Trinity court did not take into account that Tower Insurance's agent might ultimately be responsible for paying the $490,000.
Here are the facts in the instant case: First American erred in not providing the Kimbles with their policy limits of $370,000 when First American discovered that the Kimbles' title was not marketable. Had First American's misconduct not been discovered, the Kimbles could not have sold their property, leaving them with a loss of both the $1.3 million sale price of the property and the $370,000 policy limits of the First American title insurance policy. First American would have received a net gain of $370,000.

 Trinity, 261 Wis. 2d 333, ¶ 62.

 Majority op., ¶ 53 n.20 (quoting Trinity, 261 Wis. 2d 333, ¶ 58: " '[O]ur holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.'") (internal citation omitted).

 Trinity, 261 Wis. 2d 333, ¶ 60.

 Majority op., ¶ 9.

 Majority op., ¶ 10.

 The trial yielded the following testimony:
[KIMBLES' COUNSEL]: Now, at your — at your deposition, I asked you whether you made any mention of the Cofrin deed [which rendered the easement invalid] to [the Kimbles' agent] in March of 2008. Do you recall that?
[FIRST AMERICAN'S AGENT]: Yes.
[KIMBLES' COUNSEL]: And we talked about your letters that you sent back and forth with him, correct?
[FIRST AMERICAN'S AGENT]: Yes.
[KIMBLES' COUNSEL]: And you acknowledge that it's true that you never told [the Kimbles' agent] about the Cofrin deed at any time in any of your conversations or in any of your letters?
[FIRST AMERICAN’S AGENT]: That is correct.

 At trial, an investigator employed by First American testified that she asked First American's agent whether she should investigate further. The investigator suggested problems with the validity of the deed, and asked, "What does all of this mean for us?" and "Do you want me to dig for more documentation?" The investigator testified that she never received a response.

 The access to the south depended on an easement across a 25-foot strip of property. First American testified at trial that "Land Concepts [which does not want to give access] owns the fee simple interest to the 25-foot strip."

 See court of appeals brief of defendant-appellant at 21. The access to the south also needed to cross lands marked as wetlands. The trial record reflects the following exchange:
[KIMBLES' COUNSEL]: And did you take the position that the [Kimbles] had a right of access to their property to the south?
[FIRST AMERICAN'S AGENT]: Yes.
[KIMBLES’ COUNSEL]: Through an area of forest and wetlands, correct?
[FIRST AMERICAN'S AGENT]: Yes.
Yet, government regulations prohibited development on the forest and wetlands, as the defendant's agent testified:
[KIMBLES' COUNSEL]: And you know from reading [the government official's] deposition that the area that you've described is defined as wetlands according to Door County Planning, right?
[FIRST AMERICAN'S AGENT]: That's correct.
[KIMBLES' COUNSEL]: And that, in fact, Door County Planning has indicated that that area could not be developed into any road or opened or cleared, true?
[FIRST AMERICAN'S AGENT]: That is correct.

 The trial record reflects the following exchange:
[KIMBLES' COUNSEL]: Well, you recall testifying at that court trial regarding whether the company was, in fact, at that time on Tuesday going to assert that the Kimbles enjoyed a right of access by water. Do you recall that testimony?
[FIRST AMERICAN'S AGENT]: It came up. I recall it coming up.

 Wis JI — Civil 1707.1, which was given to the jury, reads in relevant part:
Punitive damages may be awarded, in addition to compensatory damages, if you find that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff.
A person's acts are malicious when they are the result of hatred, ill will, desire for revenge, or inflicted under circumstances where insult or injury is intended.
A person acts in an intentional disregard of the rights of the plaintiff if the person acts with the purpose to disregard the plaintiffs rights, or is aware that his or her acts are substantially certain to result in the plaintiffs rights being disregarded. Before you can find an intentional disregard of the rights of the plaintiff, you must be satisfied that the defendant's act or course of conduct was:
(1) deliberate;
(2) an actual disregard of the plaintiffs right to safety, health, or life, a property right, or some other right; and
(3) sufficiently aggravated to warrant punishment by punitive damages.
Factors you should consider in answering Question No. 6 [awarding the amount of punitive damages] include:
1. the grievousness of the defendant's acts,
2. the degree of malice involved,
3. the potential damage which might have been done by such acts as well as the actual damage, and
4. the defendant's ability to pay. You may consider the defendant's wealth in determining what sum of punitive damages will be enough to punish the defendant and deter the defendant and others from the same conduct in the future.
See also Wis. Stat. § 895.043(3).

 Majority op., ¶ 54.

 "[Ejven if the policy does not expressly cover lack of a right of access, if it insures against unmarketability of the title, the title insurer will be liable if no legal access to the land exists. The majority rule is that lack of access makes title unmarketable." 1 Joyce D. Palomar, Title Insurance Law § 5:8 (West 2013-2014).

 TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 460 (1993).

 Cooperman Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436 (2001).

 The wealth and financial position of the defendant are examined to assess the excessiveness of the punitive damages award. See, e.g., TXO Production Corp., 509 U.S. 443, 462 (1993); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24 (1991).

 The majority opinion states the purpose of punitive damages as follows:
[Punitive damages] are awarded "to punish the wrongdoer, and to deter the wrongdoer and others from similar conduct." Trinity, 261 Wis. 2d 333, ¶ 50. "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996).
Majority op., ¶ 43.
Justice Steinmetz articulated the reasoning behind considering the wealth of the parties in his dissent in Brown v. Maxey, 124 Wis. 2d 426, 452, 369 N.W.2d 677 (1985) (Steinmetz, J., dissenting). He stated:
The policy justifications for punitive damages are generally considered to be: punish the wrongdoer and specifically deter him and generally deter others from engaging in similar conduct.... It is almost universally accepted that money talks. By tailoring the amount of punitive damages to the relative wealth of the individual, every wrongdoer is more or less equally affected by the sanction.

 This rationale was echoed by the court in Jacque v. Steenberg Homes, 209 Wis. 2d 605, 631, 563 N.W.2d 154 (1997), which explained the need to eliminate the profit motive for wrongdoing:
Punitive damages, by removing the profit from illegal activity, can help to deter such conduct. In order to effectively do this, punitive damages must be in excess of the profit created by the misconduct so that the defendant recognizes a loss.

 Trinity, 261 Wis. 2d 333, ¶ 69 n.8.